JOHN BAPTISTE BEAUBIEN AND OTHERS, COMPLAINANTS AND APPELLANTS, *v.* ANTOINE BEAUBIEN AND OTHERS, DEFENDANTS.

Where a bill in chancery was filed by persons residing in Canada, claiming title to property in Detroit which had been in the exclusive possession of the defendants and those claiming under them since 1793, without, as far as appears, any right being set up by the complainants or by those claiming under them to the title or the possession of the premises until the filing of the bill, or any claim to the rents and profits or to an account as tenants in common, or for partition, or to be admitted to the enjoyment of any right as co-heirs, the case is one resting upon the enforcement of an implied trust, where courts of equity follow the courts of law in applying the statute of limitations.

The averments of concealment and fraud on the part of the defendants, which

are made in the bill for the purpose of withdrawing the case from the opera- tion of the statute, are too general and indefinite to have that effect.

No acts of fraud or concealment are stated; and the time when even an inten- tion to defraud, which is all that is averred, was discovered, was some fifty years after the exclusive possession of the defendants and those under whom they claim had commenced; and this, although the parties lived in the neigh- borhood and almost in sight of the city which has, in the mean time, grown up on the premises.

This was an appeal from the Circuit Court of the United States for the district of Michigan.

It was a bill filed on the equity side of the court, by John Baptiste Beaubien and twenty-one others, aliens and residents of Canada, against Antoine Beaubien and one hundred and twenty-seven others, thirteen of whom were citizens of Michi- gan and residents of Detroit. The rest of the defendants were admitted to be parties by order of the court.

The complainants began the history of their title as early as 1745, when the Governor and Intendant of the Territory gave to their ancestor, Beaubien, a concession of land of three arpens in front on Lake Erie, by forty arpens in depth; and after- wards, in 1747, the same persons granted to one Barois a con- cession of two arpens in front by forty arpens in depth ad- joining the above. They then traced the title down, as stated in the opinion of the court.

Some of the defendants demurred to the bill, and the rest pleaded that they were bona fide purchasers, without notice.

In 1857, the court passed the following decree:

"This cause having been brought on to be heard on the de- murrer of the above defendants and others, to the amended bill of complaint, and the plea of the Right Reverend Peter Paul Le Fevre and Theodore Williams, claiming to be bona fide purchasers for a valuable consideration, without notice, of the lands and premises owned and claimed by them on the Antoine Beaubien and Lambert Beaubien farms, described in the bill of complaint and in said plea, and the said demurrer and plea having been argued by G. T. Sheldon, solicitor and counsel, and W. H. Emmons, counsel for said defendants, and Messrs. Burt and Maynard, counsel for the complainants, and

the arguments of counsel having been duly considered, i is ordered, adjudged, and decreed, that the demurrer hereto fore filed of the above defendants, Theodore Williams and the Right Reverend Peter Paul Le Fevre and others, claiming a portion of the lands and premises in the bill of complaint mentioned, as heirs, donees, or otherwise, without valuable consideration, be, and is hereby, sustained; and the said plea of the said defendants, Right Reverend Peter Paul Le Fevre and Theodore Williams, claiming other portions of said lands and premises in their said plea mentioned, as bona fide purchasers for a valuable consideration, without notice, having been argued by the respective counsel, and the arguments of counsel having been duly considered, it is ordered, adjudged, and decreed, that the said plea of the said defendants, Peter Paul Le Fevre and Theodore Williams, be, and is hereby, sustained; and that the said bill of complaint of the complainants, as to all said land and premises described and set forth in said plea, be, and is hereby, dismissed."

From this decree, the complainants appealed to this court.

It was submitted on printed arguments by *Mr. Platt Smith* for the appellants, and *Mr. Carlisle* for the appellees, upon a brief filed by himself, *Mr. Emmons*, and *Mr. Russell*.

After *Mr. Smith* had argued that the bill set forth a complete title, and that the facts charged were admitted by the pleadings, he proceeded to notice the question of the lapse of time.

Lapse of time is not made a question by the pleadings; the court will not presume for the defendants what they do not claim for themselves.

Anthony Bledsoe was killed by the Indians, 20th July, 1788; he made a will, devising "my estate to be equally divided amongst my children; to each of my daughters a small tract of land." He left five sons and six daughters. There were 6,280 acres of land in Tennessee; the executors assigned 320 acres to each of the girls, and made deeds. Polly, the eighth child, in 1799 being then a minor, married Weatherhead,

she and her husband took possession of the 320 acres that had been assigned to her. In 1801, the residue of the lands was divided among the sons. In 1818, Polly Weatherhead and her husband sold the 320 acres that had been assigned to her, and they removed to Mississippi. In 1843, Mr. Weatherhead died. In 1846, Polly Weatherhead brought suit for her portion of the whole tract. The boys and their grantees had made valuable improvements, built brick houses, &c. The suit was brought fifty-eight years after the death of the ancestor, fifty-three years after the partition among the girls, forty-five years after that among the boys. She maintained her suit.

> Weatherhead's Lessee *v.* Baskerville et al., 11 Howard, 329, 359, 360.

In Stackpole *v.* Davoren, an account of rents and profits of an estate was decreed, after an adverse possession of fifty years.

> 1 Bro. P. C., 9, referred to in Hill on Trustees, 265.

In a recent case, Sir C. Pepys, M. R., set aside a purchase by a steward at an undervalue after an interval of forty-seven years.

> 2d June, 1835, affirmed 11 Cl. and F., 714.
> Hill on Trustees, 265, where reference is given to many other cases of like tendency.

A case is reported in 5 Sim., 640. There the defendants had been in possession for seventy years; and to a bill filed by the remainder man to recover the estate, a plea was put in, stating that adverse possession of the property had been held during the whole time; and that the rents and profits had been received. The vice chancellor overruled the plea, and, on an appeal taken, his decision was affirmed by Chancellor Brougham.

> Mylne and Keen, 738, cited in 16 Pet., 468.

In 1747, Edward Charlton, under whom plaintiffs claimed, being indebted to John Rooke by a judgment, it was agreed between them that Rooke should be put into possession of the rents and profits of the estate in question, until the debt should be satisfied, which agreement was carried into effect,

and Rooke entered into and remained in possession till 1752. Edward Charlton, being at that time indebted to John Reed, under whom defendants claimed, Reed made an agreement with Rooke, for an assignment of what remained due by Charlton to Rooke; under this agreement, Reed entered into possession, and he and his family continued in possession up to 1821. Edward Charlton died in 1767, leaving a widow and a son, then under age. The son married in 1778, and died in 1797, leaving a son, an infant. The question was, whether, under the circumstances, a conveyance either from Edward Charlton or William Charlton to the Reed family might be presumed. Uuder the instruction of Bayley, J., the jury found for the plaintiff. Abbot, C. J., says: "I am clearly of opinion that the direction was according to law. In cases where the original possession cannot be accounted for, and would be unlawful unless there had been a grant, the rule may perhaps be different; and all of the cases cited are of that description. Here the original possession is accounted for, and is consistent with the fact of there having been no conveyance." Bayley, J., says: "The deeds of 1747 and 1752 were both produced, and if there had been a conveyance, it would probably have been produced also." Holroyd, J., says: "Here the original enjoyment was consistent with the fact of there having been no conveyance, for it was in satisfaction of a debt. The true question was presented to the jury.

Doe, d. Fenwick *v.* Reed, 5 Barn. and Ald., 232.

7 English Common Law, 79.

Both parties claim by descent from John Ormsby, sen., who died in Pennsylvania in 1805. The deceased had a son, Oliver, who survived him, and who administered on his estate; and a daughter, Sidney, who married Isaac Gregg. He had also a son, called John Ormsby, jun., who married in the Mississippi country, and died in 1795. Mary Swayze, the wife of the plaintiff, is the daughter of this son, and was an infant at his decease. In 1807, Oliver Ormsby gave bond as administrator of his father's estate; he never settled the administration account. In 1826, as administrator, he confessed a judgment for 467 dollars in favor of Messrs. Penns. He

allowed the lands of his father to be sold on execution on this judgment; they were bid off by Mr. Ross, the attorney for the Messrs. Penns, at the sum of three thousand dollars, Mr. Ross declaring that neither he nor his clients wanted the lands, but that he should allow them to be redeemed for the amount of the judgment and the costs. In 1831, four years after the sheriff's sale, Oliver Ormsby paid Ross 523 dollars, and took a deed from him of the lands; he receipted to the sheriff, as administrator, for the three thousand dollars, after deducting what he had paid to Ross. Mrs. Swayze brought suit in 1833, and recovered; the court held that the sheriff's deed to Ross, and the deed from Ross to Oliver Ormsby, did not stand in her way.

Swayze *v.* Burke, 12 Peters, 11.

"The executor of an officer in the Virginia line on the continental establishment obtained a certificate from the Executive Council of Virginia, as executor, for four thousand acres of land, in the Virginia reserve, in the State of Ohio, and afterwards sold and assigned the same. Entries were made, and warrants issued in favor of the assignees, and a survey was made, under one of the warrants, in favor of one of the assignees, a bona fide purchaser, who obtained a patent from the United States for the land. It appeared that the executor had no right, under the will, to sell the land to which the testator was entitled. The patent was granted in 1818, and the patentee had been in possession of the land from 1808. The heirs of the officer entitled to the land for military services, in 1839, some of them being minors, filed a bill to compel the patentee to convey the land held by him to them. Held that the patentee was a purchaser, with notice of the prior title of heirs, and that he was bound to make the conveyance asked from him." "No principle is better established than that a purchaser must look to every part of the title which is essential to its validity."

Brush *v.* Ware, 15 Peters, 93.

*The plea is no bar to the matters set up in the bill.*

The plea of a purchaser for valuable consideration, without

notice, should aver that the person from whom he purchased had such an interest in the property as entitled him to convey it to the defendant.

2 Daniels Ch. Pr., 687.

Head *v.* Edgerton, 3 P. Williams, 281.

Daniels *v.* Davison, 16 Ves., 252.

Craig *v.* Leiper, 2 Yerger, 196.

The plea traces title from the United States. But this is not enough, for a pre-existing title is distinctly averred and set forth in the bill; and it has been repeatedly held that a patent from the United States does not affect a pre-existing title in a third person.

City of New Orleans *v.* Armas and Cucullu, 9 Pet., 236.

United States *v.* Arredondo, 6 Pet., 738.

The bill charges that this patent was obtained by the fraud of Antoine Beaubien, the patentee; that the patent was based on the French titles under which plaintiffs claim; which patent, so far as it purports to convey anything to said Antoine, is fraudulent and void as against complainants; the bill also charges that defendants or some of them have possession of the documents of the original title. The plea does not undertake to deny the fraud, or that the patent was obtained on the claim founded on the original French titles, or that the defendants have not the original title papers; all these should be negatived by averment in the plea.

2 Daniels Ch. Pr., 691.

Possession to be adverse, must be in good faith, and not a precarious possession, such as a *possessio fratris*, or a fraudulent possession. Domat.

"And it has been held, that if a widow remains in possession of land after her husband's death; and marries again, and she and her husband continue in possession for more than the time limited for the right of entry, neither she nor he can set up the statute against an ejectment by the children of the first husband. [Cook *v.* Nicholas, 2 Watts and S., 27.] There was a very rigid application of the law, in this respect, in a very modern case, in the Court of King's Bench in Ireland, in which it was held, that where, on the death of a

*Beaubien et al.* v. *Beaubien et al.*

father intestate, seized of lands in fee, his second son enters without title, such entry is deemed for the use of the eldest son; and the statute, therefore, does not run against such eldest son, the possession of the second son being his possession. [Dowdall *r.* Byrne, Batt. (Irish) R., 373.] The real principle, to be extracted from all the cases, the court said, is, that the possession of the younger brother, so entering, is the possession of the heir, who, therefore, cannot be affected by length of time, upon the supposition of a possession adverse to him; and, on this principle, the court found an answer to the argument that the circumstances or motives of the party taking possession ought to be left to the jury, because the question is, not why the one person took posses sion, but why the other submitted to it; and in the absence of any proof to the contrary, it must be intended that he did so because (as the law intends) it was taken for him."

Angell on Limitations, p. 402.

The points made by the counsel for the appellees will be given, although the argument is inserted upon those only which were decided by the court.

I. The claim of the complainants is barred by the acts of Congress and the action under them, by which Antoine Beaubien obtained a patent.

II. The claim in this case is barred by the statute of limitations.

That this defence, as well as lapse of time generally, may be taken by demurrer.

Petro *v.* Massachusetts, 15 Peters, 233.
Story Eq. Pleading, secs. 503, 506, 761.
4 Wash., 631, 632; 2 Sch. and Lef., 637.
6 Sims, 51; 4 Johns. Ch., 299.
2 Ves., jun., 94; 1 Johns. Ch., 46.
1 Bald., 418; 19 Vesey, 180.
7 Paige, 195; 11 Eng. Ch., 68.

The bill in this case contains no sufficient averment to avoid the application of the statute, as we shall suggest more fully hereafter.

*Beaubien et al.* v. *Beaubien et al.*

The two acts of May 15, 1820, (R. Laws of Mich. 1833, p. 570, sec. 6,) and of Nov. 15, 1829, (R. Laws 1833, p. 408,) and especially the latter, bar all claim in this case.

R. Laws 1833, p. 408, act of 1829, provides that "No writ of right or other real action, no action of ejectment or other possessory action, of whatever name or nature, shall hereafter be sued, prosecuted, or maintained, for the recovery of any lands, tenements, or hereditaments, if the cause of action has now accrued, unless the same be brought within ten years after the passing of this act, any law, usage, or custom, to the contrary notwithstanding."

For the application of this statute to past causes of action, see laws of Michigan 1843, p. 43, declaring that all causes shall be determined by the law applicable to it, when the Rev. Stat. of 1838 were passed. See, also, judicially so holding, Douglass Mich. Rep., 307, Lesley *v.* Cramer.

We need not explain the causes which called for this subsequent legislation and decision. It is now clear the law of 1829 is that which controls the right to sue in this case.

It is hardly necessary to cite the following cases to show, that where the statute commences to run, no subsequent disability will arrest it.

15 Johns., 169.

Adams on Eq., 69, note, (1.)

1 Sugden on Vendors, 389.

3 Brod. and Bing., 217.

3 Johns. Ch., 140, and cases cited.

Plowden, 353; 4 Mass., 282.

C. and Hill, notes, 320.

And most particularly do we ask attention to the decisive fact that in this statute of 1829 there is no saving clause. The bar is general and universal. The non-resident is bound equally with the resident, the infant with the adult, and we therefore need not stop to discuss the particular circumstances of each complaint.

That where the Legislature have made no exceptions, the courts can make none.

1 Sugden on Vendors, 389.

4 Tenn., 307, per Shippen arguendo.

And many other cases cited elsewhere in this argument.

This court has repeatedly recognised this rule.

Bank of the State of Alabama *v.* Delton, 9 How., 522.

McIver *v.* Ragan, 2 Wheat., 25.

Baron *v.* Howard, 20 Howard, 25.

If, then, this action may be said to have arisen at any time before 1828, it was barred November 10, 1839.

When, within the meaning of this rule, did it arise?

The bill says Antoine Beaubien was in possession with his brother before 1800. That he presented a sole claim before the board in 1804, and did not succeed, because he failed in his attempt to prove a conveyance to himself under the French title. See Schedule A, of the bill. He then, in 1804, claimed sole ownership; attempted to prove it. This was open and notorious. A public record is made of it. All had notice of it. There is no denial that all the co-heirs had such notice; and there is no pretence that he agreed expressly to take in trust for them. This, then, was a hostile sole claim. But the bill further says, that again, in 1807, he presented another claim as sole occupant and improver. He procured witnesses to swear he was such. It was judicially determined he was such in a proceeding *in rem*, which impleaded all the world. Not only is there no averment that he agreed to hold for the other heirs, but there is not one fact or circumstance stated which could lead them to believe so. The naked, meagre, and unlawyer-like expression is used, that they "supposed" he would so hold. Our citations hereafter will show how fully insufficient this is, in order to save any statute of limitations, even under the English rule, and much less to avoid this one. Indeed he could not, without the aid of perjury, have proved in his own name, if he were not the sole occupant.

1 Harrington Mich. Rep., 130, Barnard *v.* Bougard.

These facts are abundant to show a hostile, adverse holding. But further still, he conveys the half to Lambert's heirs in 1818. This surely is an exercise of ownership. There is no denial of full knowledge of all these facts by all the co-heirs

at the time they took place. They all lived together within the area of a mile. The court will take judicial notice that the town in Canada, where some of them reside, adjoins. the town of Detroit, where Antoine and Lambert lived.

In 1840, the bill admitted they knew the fraud. Even under a loose rule, which would give them ten years from this discovery, the legal bar would be complete in 1850, five years before this bill was filed. But there is no such rule. They must be prompt in filing the bill after discovery. Under a twenty years' statute they cannot, because there is fraud, delay forty years, if there is twenty years before the discovery. But fraud is an excuse only where they are diligent the moment they discover the fraud; otherwise, their rights are barred.

But, what is controlling here is, the bill concedes all the original heirs knew the facts. Numerous decisions show this is sufficient for our protection. There is no concealment, no agreement, no act to mislead, imputed to Antoine Beaubien. The naked case is stated, of a right in six heirs, who live in the neighborhood of their brother, having equal intelligence and means, having full knowledge of his open claims, his procuration of title, his sales, his exclusive occupancy without one word of claim on their part, or concession of right on his, from 1800 down to 1840, when, for the first time in forty years, the great-grandchildren of the original heirs began to "suspect" that the grandchildren (and their grantees) of the co-heir of their ancestors intend to claim this land as their own! Such a bill is but a delusion. It is demurable. It contains no sufficient reasons to avoid the application of the statute.

We submit the act of 1829 is a complete bar.

But the act of May 15, 1820, is equally a bar. In the circumstances of this case, the disabilities of non-residence, infancy, and coverture, are wholly immaterial. There can be no successive disabilities, either in the same person, or set up in succeeding heirs. If the disabilities of the first takers are removed, the heirs must sue within ten years or twenty years, (according to the statute thereafter.) Thus, if A, an heir, be a

non-resident, and dies, and his heir is also a non-resident, the disability of the latter cannot be added to that of his ancestor, but he must sue within the time limited after the death of the first taker; otherwise, statutes of limitation would be perpetual.

The act of 1820 limits the right of action to twenty years, and the saving section is as follows:

"This act shall not extend to bar any infant, person imprisoned, beyond seas, &c., &c., from bringing either of the actions before mentioned within the term before set and limited for bringing such actions, calculating from the time such impediment shall be removed."

In 10 Ohio, 513, Whitney v. Webb:

Plaintiff resided out of, and had never been within the State of Ohio, and his ancestor, and those under whom the ancestor claimed, had in their lifetime been in the same situation; and the question was, whether the exception in the law (which was like ours) saved the rights of the plaintiff, who and whose ancestors had been successively and continually under the technical disability of non-residence.

The court cites and analyzes Plowd., 358; 6 East, 80; 4 Miss., 182; 2 Conn., 27; and 3 Johns. Ch., 129—which is an elaborate review of all the old cases—and hold that the action was barred immediately on the death of the ancestor or first taker, provided twenty years had then elapsed. That as the statute provided for no period after that for the heir to sue, and saved the rights only of the person to whom the right accrued, there was no mode in which by mere construction the heir could be allowed any time after the lapse of twenty years. That the person to whom the right accrued might have sued within twenty years after his disability removed. But this right did not accrue to the heir. Page 517 says, successive disabilities cannot be set up where they exist in the same person, any more than when one man attempts to protect himself by one in himself after the removal of one in his ancestor.

The doctrine was strictly applied in a case in equity in the same volume, 10 Ohio, 524, Ridley v. Wethman, where a

bill was dismissed on the plea of the statute of limitations, when it appeared that the complainants sought to avail themselves of successive disabilities of non-residence.

The court, in 16 Howard, 247, Thorp *v.* Raymond, held that where a right of entry accrued to a person who was under disability, and so continued until his death, the statute began to run immediately upon his death, although the heir was under disability. This under New York statute similar to ours.

The non-residence of the complainants is immaterial, even if the act of 1829 contained any exceptions, which it does not; under this principle, the law of 1820 equally bars the whole action.

The court will not fail to perceive the disgraceful vagueness and studied evasion with which the bill is drawn.

It makes no averment that these complainants have been continuously out of the Territory and the State of Michigan. Such it is notorious is not the fact. They all reside within half a mile of Detroit, and, though in Canada, are and have for years, as have all their ancestors, been weekly there. Hence the statement that they have "resided" in Canada.

This may be true, and still, if they have been within the State, the running of the statutes will be conceded. No authority need be cited for this. The bill should have averred that the complainants had not been within the State. See the common precedents of pleading the old exception of "beyond seas."

This, then, answers the pretence that some of the complainants are within the exceptions of the statute of 1820.

Still, we repeat, that of 1829 has no exceptions.

That our holding is adverse, so as to start the running of the statute, whether it be said there is a trust or a tenancy in common, we cite a few decisions. They show equally what we cannot take time distinctly to argue, that this is a case where the presumption of a grant is full and clear.

Still, the main object is to show an adverse holding within the statute of limitations.

4 Mason, 326, Prescott *v.* Nevens.

2 Smith's Leading Cases, 450.

Notes to Taylor *v.* Horde, in 1 Burr, 60.

Nessun *v.* Doe, in 1 M. and W., 910.

If a party holds in a character incompatible with the idea of a freehold in another, his holding is adverse. In order to ascertain the character of the holding, courts will look at the parties' conduct while in possession. The cases are very fully cited in 5 Bing. N. C., 161; Eng. Com. Law Rep., 65, Davis *v.* Lowndes; see per Tindal, Ch. J., page 71; also, pages 72, 73, 74. For the evidence in the case, see page 66.

That a patent from the Government invests the patentee with seizure in law, so that he is considered in actual possession until an ouster by a third person.

2 Smith's Leading Cases, 469.

The patentee's conveyance transfers a like possession to his grantee.

4 Wheat, 215, Burr *v.* Grottz's Heirs.

2 Smith's Leading Cases, 469.

There need not be an assertion of any previous title, but an assumption of ownership at the time of the entry and during the occupancy, and this is what is meant by its being made " under claim or color of right."

Page 472 cites the cases fully, to show that one tenant in common, by claiming to hold as owner of the whole, will constitute an ouster of his co-tenant.

In 24 Wendell, 601, 602, Humbert *v.* Trinity Church, on page cited, it is said: " Although a man may hold possession rightfully as a tenant in common, and the presumption is that he does so, still the contrary may be shown; and if his conduct be such as to satisfy the mind that he means to hold out his co-tenants, and he does in fact exclude them, this is an ouster, his possession is adverse, and the statute will apply as fully as if he never had any right to claim as a tenant in common." See the preceding pages, where the facts evincing the claim of title of the defendant are commented on. They are no more decisive than the averments in the present bill.

III. The statute of limitations of Michigan relied on in this case is broader than the English statute, and it is oqually a

bar in a court of equity as at law. This court under this statute can make no exception in cases of undiscovered fraud.

The English statutes of limitations simply bar certain enumerated legal actions, and none of them therefore apply in terms to proceedings in equity. Hence courts, acting simply from analogy, felt at liberty to make exceptions in cases when conscience demanded it. And as we pass over the cases under the following divisions, the truth of our averment will abundantly appear, that the only reason why courts have made such exceptions, is that there were no words in the statute which literally could be extended to courts of equity.

That the courts can make no exceptions when the statute makes none, see ante. That infants, feme coverts, and persons beyond seas, are all concluded when not expressly excepted. See Humbert. *v.* Trinty Ch., 24 Wendell, ante, and the cases cited, to show that when the statute applies *ex directu,* then even fraud makes no difference, and that case goes the length of saying that in cases of concurrent jurisdiction, fraud is no excuse, even in equity, under a statute which in terms did not apply to a court of equity.

But it is not necessary for us to go thus far here. Our statute does apply equally to a court of equity as to that of law. Its language is, "no real or possessory action, of whatever name or nature," shall be sustained after ten years from 1829. So is the act also of 1820.

Farmer *v.* Brooks, 9 Pick., 242; Johnson *v.* Ames, 11 Pick., 182, are directly in point, holding that a statute like this bound, *ex directu,* both courts of equity and law alike.

We claim this statute has no exceptions, express or implied, at law or in equity. That the court can engraft none upon it, growing out of the ignorance, infancy, or non-residence of the complainant, or the alleged frauds of the defendants; see authorites cited under II.

Very many decisions fully set forth the reasons of the equity rule in England, as we have stated it. This grows out of the words of their statute, and when one like ours comes up as in 17 Ves., they apply it as they would in an ejectment.

IV.- If it is held that this act is to receive the same construc-

tion as those which simply bar specifically enumerated legal actions, and that this court will therefore admit the same exceptions to its applications, such as trust and undiscovered fraud, then we say the bill does not set up facts to bring the case within these exceptions, and the remedy is barred by the statute under the general principle applicable to all statutes of limitations.

V. If the complainants contend there was a complete legal title under the French grant, this wholly answers the argument that the statute of limitations does not apply, because the defendants hold in trust, and the complainants were ignorant of the fraud.

VI. The bill does not show a legal title under the French grant.

VII. The plea of bona fide purchasers is a good plea, both in form and substance, and constitutes a perfect bar to the matters set up in the bill.

VIII. The bill does not show or state the citizenship of the several defendants brought in by the amendment thereto, and is therefore fatally defective.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the district of the State of Michigan.

The bill was filed by the plaintiffs against the defendants, claiming to be tenants in common with them in a tract of land now lying in the city of Detroit, each party deriving title from a common ancestor, who made the settlement as early as the year 1745, under a concession from the French Government. The tract contained five arpens in front on Lake Erie, and eighty arpens back. The ancestor, John Baptiste Beaubien, died in 1793, having had the uninterrupted possession of the property from the time of the concession in 1745, leaving a widow and several children. Two of the sons, Antoine and Lambert, resided with their father at the time of his death, and continued in the possession and occupation with their mother till her death, in 1809.

In 1804, Antoine, one of the heirs in possession, applied to

the board of commissioners to adjust land claims, under the act of Congress of 1804, to confirm his claim to the land; and which was confirmed accordingly, and a patent issued in 1812. Acts of Congress, 26th March, 1804; 3d March, 1805; 3d March, 1807.

Lambert, the other brother, continued in the joint occupation of the tract till his death, in 1815, and subsequently, in 1818, Antoine conveyed to the heirs of Lambert a moiety of the premises; and the present occupants and defendants are the descendants of the two brothers, or purchasers from them under this title.

The tract constitutes a portion of the city of Detroit, and is averred in the bill to have been worth, at the time of the filing of it in 1855, from half a million to a million of dollars, exclusive of the improvements.

The case was presented to the court below on demurrer to the bill, and on pleas by some of the defendants, as bona fide purchasers for valuable consideration, without notice.

The plaintiffs aver in the bill, in addition to the facts already stated, that they are the descendants of the brothers and sisters of Antoine and Lambert, from whom the title of the defendants is derived, and that Antoine and Lambert and their descendants possessed and occupied the tract in subordination to the right and title of their co-tenants, and that they were permitted to possess and occupy the same in confidence, that they so held the premises for the common benefit of all parties interested. They further aver, that they verily believed that the brothers, Antoine and Lambert, and their legal representatives, were acting in good faith in this respect, until about the year 1840 they discovered, after examination and inquiry into the facts and circumstances, that they intended to cheat and defraud them, and those under whom they claim, of their just rights in the premises.

The bill further states that Antoine, in his lifetime, and his son, who is one of the defendants, and the heirs of Lambert, have conveyed to divers individuals rights in the said tract; that, in some instances, they made donations without consideration; in others, conveyances for a pretended consideration;

and that there now are in possession, as heirs, donees, and purchasers of different portions of the premises, several hundred persons, most of whose names are unknown to the plaintiffs, which persons set up claims and pretended rights and interests therein. And further, that neither Antoine nor Lambert's heirs, down to the year 1834, committed any open or notorious act, inconsistent with the rights of the plaintiffs, or in any way disavowed the trust and relation as co-tenant, or of brothers or co-heirs, nor in any manner asserted any title to the land, to the exclusion of their rights.

The court decreed upon the demurrer to the bill, and also upon the pleas, in favor of the defendants.

The case comes before us on an appeal from this decree. Antoine and Lambert, the two sons of J. B. Beaubien, the common ancestor, and those claiming under them, have been in the exclusive possession of the premises in question since 1793, a period of sixty-two years before the commencement of this suit. The plaintiffs and those under whom they claim, during all this time, as averred in the bill, resided in Canada, and, as appears, most of them in the county of Essex, in the neighborhood of the premises. The four hundred arpens which, in 1793, were worth some six or seven thousand dollars, now embrace a portion of the city of Detroit, and are worth, with the improvements, over a million of dollars; and, for aught that is averred in the bill or appears in the case, no right has been set up by them, or by those under whom they claim, to the title or the possession of the premises, until the filing of the bill; no claim to the rents and profits, or to an account as tenants in common, or for partition, or to be admitted to the enjoyment of any right as co-heirs.

The case is one, so far as the title of the plaintiffs is concerned, which depends upon the establishment of an implied trust to be raised by the evidence, and hence falls within that class of cases in which courts of equity follow the courts of law, in applying the statute of limitations. (Kane *v.* Bloodgood, 7 John. Ch. R., 91; Hovenden *v.* Annesly, 2 Sch. and Lef., 607.)

There are two acts of limitation in the State of Michigan, either of which bars the claim of the plaintiffs:

*Beaubien et al.* v. *Beaubien et al.*

1. The act of May 15, 1820, which limits the right of action to twenty years after the same has accrued; and

2. The act of November 15, 1829, which limits the right of entry to ten years, if the cause of action has then accrued.

The language is: "No writ of right or other real action, no ejectment or other possessory action, &c., shall hereafter be sued, &c., if the cause of action has now accrued, unless the same be brought within ten years after the passage of this act, any law, usage, or custom, to the contrary notwithstanding."

There is no saving clause in this as to infants, feme coverts, or residence beyond seas.

The pleader has sought to avoid the operation of the limitation, by an averment of concealment and fraud on the part of the defendants, and those under whom they claim. The plaintiffs aver, "that, until within the last few years, your orators and oratrixes, and those under whom they claim, verily believed and supposed that the said brothers, Antoine and Lambert, and their legal representatives, were acting in good faith towards them, but that, about the year 1840, they discovered by information, after examination and inquiry into the facts and circumstances of the case, that the said brothers, Antoine and Lambert, and their legal representatives, intended to cheat and defraud them, and those under whom they claim, of their just rights in the premises."

This averment is too general and indefinite to have the effect to avoid the operation of the statute. The particular acts of fraud or concealment should have been set forth by distinct averments, as well as the time when discovered, so that the court may see whether, by the exercise of ordinary diligence, the discovery might not have been before made. (Stearns *v.* Page, 7 Howard, 819; Moore *v.* Greene, 19 ib., 69.)

Here, no acts of fraud or concealment are stated; and the time when even an intention to defraud, which is all that is averred, was discovered, was some fifty years after the exclusive possession of the defendants and those under whom they claim had commenced; and this, although the parties lived in the neighborhood, and almost in sight of the city, which has, in the mean time, grown up on the premises.

We think the statute of limitation applies, and tha' the decree of the court below should be affirmed.