## WARE *v.* GALVESTON CITY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF TEXAS.

No. 28. Submitted November 1, 1892. — Decided November 14, 1892.

The doctrine of laches applied to a suit in equity, the bill having been filed in 1881, more than 35 years after the cause of action accrued; and information having been obtained by the agent of the plaintiffs, in 1843, which imposed the duty of further inquiry; and like information having been obtained in 1854, and in 1858, and in 1869.

There was no distinct averment in the bill as to the time when the alleged fraud was discovered, and what the discovery was, nor did the bill or the proof show that the delay was consistent with the requisite diligence.

As to the statute of limitation, as affecting the question of laches, all the plaintiffs were capable of suing from 1854.

THE case is stated in the opinion.

*Mr. Walter Gresham, Mr. M. C. McLemore, Mr. S. W. Jones* and *Mr. G. E. Mann* for appellants submitted on their brief; citing, on the question of laches, *Oliver* v. *Piatt,* 3 How. 333, 411; *Bayard* v. *Farmers' and Mechanics' Bank,* 52 Penn. St. 232; *Telegraph Co.* v. *Davenport,* 97 U. S. 369; *Meader* v. *Norton,* 11 Wall. 442; *Bailey* v. *Glover,* 21 Wall.

342; *Michaud* v. *Girod*, 4 How. 502, 561; *Sears* v. *Eastburn*, 10 How. 187; *Galt* v. *Galloway*, 4 Pet. 332; *Holdsworth* v. *Evans*, L. R. 3 H. L. 263, 275; *Ormsby* v. *Vermont Copper Mining Co.*, 56 N. Y. 623.

*Mr. A. H. Willie* for appellee submitted on his brief.

Mr. Justice Blatchford delivered the opinion of the court.

This is a suit in equity, brought in the Circuit Court of the United States for the Eastern District of Texas, on March 18, 1881, by Asenath A. Ware, the widow of Robert J. Ware and the daughter of David White; David P. Lumpkin, the son of Lucy S. Lumpkin, a deceased daughter of said David White; Mary A. Holtzclaw, daughter of Mary A. Cowles, a deceased daughter of said David White, and James T. Holtzclaw, husband of the said Mary A. Holtzclaw; Thomas W. Cowles, son of said Mary A. Cowles; and Daniel O. White and Clement B. White, sons of J. Osborne White, a deceased son of the said David White, the plaintiffs being citizens of Alabama and Florida; against the Galveston City Company, a Texas corporation. The plaintiffs filed the bill as heirs at law of the said David White.

The bill set forth that on June 15, 1837, one Michael B. Menard, of the first part, Robert Triplett, Sterling Neblett, and William F. Gray, of the second part, and Thomas Green, Levi Jones, and William R. Johnson, of the third part, entered into a written agreement, which recited that Menard claimed title to a league and labor of land, consisting of 4605 acres, situated on the east end of Galveston Island, in the territory of the Republic of Texas; that, Triplett claiming on behalf of himself and Neblett and Gray 640 acres of land, part of said league and labor, articles of agreement were entered into by Menard and Triplett, bearing date April 11, 1837, by which Menard agreed to relinquish to Triplett 640 acres out of said league and labor; that Menard, by deed or act bearing date April 18, 1837, conveyed the residue of said league and labor, after deducting the said 640 acres, to Jones, to be sold and

disposed of by him in the manner and for the purposes prescribed in the said act or deed; that Jones, intending to execute the trust created by said deed, had proposed to divide the premises into 1000 shares, for which certificates were to be issued to the purchasers, and in pursuance thereof had actually issued certificates for 400 shares, of which it was believed many shares had been sold; that Triplett, together with Menard, by deed duly executed by them, had conveyed the 640 acres to Green, Jones, and Johnson, to be sold and disposed of in the manner therein prescribed; that, after further reciting that, it being the intention of all the parties to lay off the league and labor of land into lots for the purpose of building a town thereon, it had been found most beneficial to the parties concerned that the whole of said league and labor should be held on joint account in the proportions thereinafter specified, and should be under the control and at the disposition of the same set of trustees, acting upon one common plan in regard to the whole, instead of being held partly by Jones and partly by Green, Jones and Johnson, under different titles and plans, it was witnessed that the parties thereto covenanted and agreed with each other, among other things, that the said league and labor of land should be conveyed to Green, Jones and Johnson, as trustees and commissioners, to carry into effect the purposes of the agreement; that the said league and labor of land should be divided by the trustees into 1000 shares, of which the 400 shares for which certificates had been issued by Jones should be regarded as 400 shares, and the lawful holders of the said certificates should be on the same footing and entitled to the same rights with the holders of certificates issued under said agreement of June 15, 1837, and upon surrendering their said certificates new certificates in lieu thereof should be issued by said trustees; that the remaining 600 shares should be sold by said trustees in such manner as they should think expedient, no share to be sold for a less sum than $1500, unless a majority of said trustees should be of opinion that it would be expedient to reduce the price; that a certificate, signed by at least two of the trustees, should be issued to every purchaser, who should have a right to

demand a separate certificate for each share; that the certificates should be transferable by assignment in writing thereon, signed and sealed by the holder, and acknowledged in the presence of two witnesses before any justice of the peace or notary public; that the trustees, as soon as, in their opinion, a sufficient number of shares had been sold, should call a meeting of the shareholders at such time and place as should be designated by them, of which they should give sufficient and convenient notice to shareholders; that the trustees should hold the title to the said league and labor of land, subject to the orders of the shareholders, as adopted at their general meetings, and the rules and regulations prescribed by them, and make all conveyances which the shareholders might require them to make, any two of them being authorized to make conveyances and perform all other acts; and that it was thereby further witnessed that the parties thereto of the first and second parts, in consideration of the premises thereto, and the further consideration of $10 to them in hand paid by the parties of the third part, did thereby sell and convey unto Green, Jones, and Johnson, their heirs and assigns, the said league and labor, in trust to execute the agreements thereinbefore set forth.

The bill further showed that Green, Jones and Johnson accepted the trust created by said written instrument, and took upon themselves its discharge, and in June, 1837, having supplied themselves with 1000 printed certificates, as the representatives of a like number of shares, which certificates were bound into five books of 200 certificates each, designated as Books A, B, C, D, and E, solicited subscriptions for shares; that many persons became purchasers for value and owners of shares therein, to whom said trustees issued a certificate of ownership for each share so purchased; that on April 13, 1838, on due notice given by said trustees, the shareholders held a meeting in Galveston, Texas, and formally organized themselves into a joint stock company, under the name of the Galveston City Company, by the election of a president and four directors, who were to constitute the board of directors of the company, and to whom was confided the care and control of

its property, with power to pass ordinances and by-laws for its government, appoint an agent, apply for a charter of incorporation, require from said trustees a deed for said league and labor of land, so as to vest the legal title in the said board of directors and their successors, lay off the land into blocks and lots, make sales thereof and convey title to the purchasers, declare dividends of the proceeds of sales among the stockholders, and otherwise manage and control the property as they might deem best for the interest of the company; but the bill alleged that said trustees, with the approval and consent of the company, continued to make sales of shares in its stock, and as many as 1000, the number designated in said written articles, eventually were disposed of, and certificates of ownership thereof issued by said trustees to persons entitled thereto.

The bill further showed that David White, late of Mobile, Alabama, in his lifetime, on November 7, 1838, subscribed for and became the owner and proprietor of 67 shares in the capital stock of said company, in evidence of which the said trustees appointed under the instrument of June 15, 1837, issued and delivered to him 67 certificates of ownership, duly signed by two of them, to wit, 17 out of Book A, numbered from 108 to 124, inclusive, and 50 out of Book C, numbered from 1 to 50, inclusive, each certificate being in the form set forth in the margin.[1]

---

[1] "City of Galveston in one thousand shares.

"The proprietors, M. B. Menard, Robert Triplett, Sterling Neblett, and Wm. Fairfax Gray conveyed to the undersigned, as trustees, by their deed of the 15th of June, 1837, a league and labor of land containing 4605 acres on the east end of Galveston Island, to be sold as joint stock in 1000 shares.

"By the terms of said deed certificates of shares when issued are to be assigned by endorsement under hand and seal, in the presence of two witnesses, before any justice of the peace or notary public.

"The trustees, any two of whom may act, are to call a meeting of the shareholders when deemed advisable.

"In the proceedings of the stockholders in general meeting each share to be entitled to one vote and to be represented in person or by proxy, and a majority in interest to determine all questions which may arise. The company may prescribe such rules and regulations for its government and management and give such orders and directions to the trustees for the sale

Opinion of the Court.

The bill further showed that on December 31, 1838, at a regular meeting of the board of directors of the company, an ordinance was passed by it requiring its agent, as soon as a charter could be procured; to open a book for the registration and transfer of stock, and to give due notice of such opening, and conferring the right on stockholders, after such notice, to file and register the certificates issued to them by the said trustees, and receive in lieu thereof certificates under the seal of the company stating the number of shares to which the party was entitled, which last certificate should not be transferred, except on the regular books of transfer of the company, and should be necessary in every case to entitle the shareholder to receive the dividends due him; that another ordinance was passed requiring the trustees to convey said league and labor to the five persons who were then the directors of the company, and their successors in office; that on April 12, 1839, the said trustees, by deed duly executed and recorded, conveyed the said league and labor in fee to the said directors, by virtue whereof the latter became seized and possessed of it in trust for the stockholders of the company; that afterwards the said Galveston City Company was incorporated under the same name by an act of the Congress of the Republic of Texas, approved February 5, 1841; and that said David White was one of the original corporators thereof.

---

of lots or any other purpose as it may think promotive of the general interest.

" *Certificate of Stock. Book*—, *No.* —.

" This is to certify that we, Levi Jones, William R. Johnson and Thomas Green, trustees of the city of, Galveston, in consideration of ——, do grant, bargain and sell to David White, his heirs and assigns forever, one share, No.—, in the city of Galveston, to be holden and enjoyed by him and his assigns upon the terms prescribed in the deed bearing date the 15th of June, 1837, of M. B. Menard, Robert Triplett, Sterling Neblett, and William Fairfax Gray, constituting us the trustees, and in the agreement entered into between us and the stockholders in said city, as set forth in the proposal for subscription.

" Witness our hands this 7th day of November, 1838.

" LEVI JONES, ·

" THOMAS GREEN,

" *Trustees.*"

The bill further showed that the directors of the company laid off the said land into blocks and lots, and offered the same for sale, and from time to time made sales and conveyances, of numerous parcels of it to different persons, receiving in part consideration therefor $1,000,000 and upwards; that there remains a large portion yet unsold, of the value of $500,000 and upwards; that the company adopted the policy of accepting from its stockholders shares of stock in exchange for its lands, and the directors, in a large majority of the sales of lots by them, accepted and received from the purchasers in payment therefor, instead of a money consideration, a surrender of shares in the capital stock of said company, owned by said purchasers, in all such instances cancelling upon the books of the company the shares thus surrendered; that very many shares had been in that manner retired, until now there were not more than 50 shares outstanding; that no dividend of the cash proceeds arising from sales of land had been declared among the stockholders, although the same had always greatly exceeded the expenses of the company, but the profits had been permitted to accumulate; and that the market value of a share in the capital stock of the company far exceeded now the face value of such share, to wit, $10,000 and upwards.

The bill further showed that on April 8, 1839, by an instrument in writing, White appointed one Abner S. Lipscomb his attorney in fact, for him, among other things, to transfer any or all of his Galveston stock, or any interest he might have in the city of Galveston; that White thereupon delivered to Lipscomb, for that purpose, the said 67 certificates of stock; that on December 3, 1841, Lipscomb surrendered to the company 3 of the certificates issued to White, namely, certificates numbered 33, 36 and 39, out of Book C, and with the consent of the company, and by an entry on its books, but without authority and in fraud of the rights of White, transferred the 3 shares of stock represented by the 3 certificates into his own name, receiving from the company, in lieu thereof, a certificate of ownership of said three shares, issued under its seal in his name; that White died on December 10, 1841, leaving Mary S. White, his wife, the plaintiff Asenath A. Ware, his daugh-

ter, and the 5 plaintiffs who are his grandchildren, his only heirs at law; that he was entitled at the time of his death to a considerable personal estate, and possessed of 24 shares in the stock of the Galveston City Company, including the 3 shares so alleged to have been fraudulently transferred by Lipscomb into his own name; that 21 of said shares were, at the time of said White's death, standing in his name on the books of the company, and the certificates of ownership thereof so issued to him, to wit, those numbered 108, 116, 118, 119, 120, 121, 122 and 124, out of Book A, and those numbered 10, 12, 27, 28, 34, 42, 43, 44, 45, 46, 47, 48 and 49, out of Book C, were at that time in the possession or power of said Lipscomb; that the personal estate of which White died possessed was more than sufficient, exclusive of the 24 shares of stock, to pay his debts, and they had long since been paid; and that there was no administration of his estate in Texas, nor any necessity therefor.

The bill further showed that Mary S. White died in 1853, without having disposed of the right or interest she was entitled to as the widow of David White, in the said 24 shares of stock, leaving her daughter, the said Asenath, and her said 5 grandchildren her only heirs at law her surviving; and that they as such, and as the only heirs at law of David White, thereupon became entitled to said shares of stock.

The bill further showed that Lipscomb, after the death of said White, and with the connivance of the company, and by an entry on its books, but without authority, and in fraud of the rights of the plaintiffs, transferred the said 24 shares of stock to some persons unknown, the company at the time taking up and cancelling the said certificates of ownership thereof, and delivering to the transferees new certificates under its seal in their names, representing the shares to be $1000 each; that the company subsequently procured the said 24 shares, and the certificates corresponding thereto, to be surrendered to it by those to whom Lipscomb had so transferred them, or by their assigns, at the same time cancelling said shares upon its books, thus retiring them, and was now claiming the benefit thereof; that the transfer of said shares

by Lipscomb, after the death of White, was without warrant
and void, and the company, in contemplation of law, was a
party to his said illegal acts, and liable to the plaintiffs for all
the consequences thereof; and that the company held the
stock in trust for the plaintiffs.

The bill further charged that the truth of the said matters
would appear by the books, certificates, writings, papers, and
memoranda relating to said shares of stock, in the possession
or power of the company, if it would discover and produce the
same, which it refused to do, though frequently applied to for
that purpose.

The bill further charged that the company, and its agents
and servants, had always studiously concealed from the plain-
tiffs the said matters relating to the stock of the said White,
and particularly the said illegal acts of Lipscomb and the com-
pany's participation therein, by withholding from the plaintiffs
all information in reference to said stock, and refusing them
access to its books and papers; that the plaintiffs were in total
ignorance of said illegal acts of Lipscomb, and their rights in
the premises, until about 12 or 14 months next before the
filing of the bill; that the plaintiffs, except the said Asenath,
were, at the time of the death of said White, minors of
tender age, and resided in Alabama and Florida, at a distance
of 800 miles and upwards from Galveston, where Lipscomb
resided, and where the said illegal acts were committed; that
the plaintiffs were not apprised even of the fact that said
White had owned shares in the capital stock of the company,
until some years after his death; that after they were so ap-
prised, to wit, in 1869, and again on March 19, 1879, at Gal-
veston, by one Thomas J. Molton, their agent in that behalf,
and at divers other times and by other persons, they made ap-
plication to the company, its agents and servants, for informa-
tion as to what disposition, if any, had been made of the shares
owned by said White, and also for permission to examine its
books and papers, to ascertain their rights; but the company,
on every such application, declined to disclose to the plaintiffs
any facts relating to said stock, and refused them access to its
books and papers.

The bill further showed that Lipscomb died in December, 1856, notoriously insolvent, and without having accounted to the plaintiffs or any of them for the 24 shares of stock or any interest therein; that the plaintiffs had applied to the company to cancel the alleged transfers of said 24 shares and the entries of such transfers in its books, and to revive said shares in the names of the plaintiffs as the heirs at law of said White and his widow, and to enter the names of the plaintiffs in its books as the owners of said stock and to issue and deliver to them certificates therefor, in the proper form, but that it refused to comply with such requests.

The bill called for an answer, but not upon oath, the benefit whereof was expressly waived. It prayed that the alleged transfer of the 3 shares of stock by Lipscomb into his own name from that of White, and the entry thereof in the books of the company, and the delivery by it to Lipscomb of a certificate of ownership of the 3 shares, might be declared to be a fraud upon White; that it might be declared that the alleged transfers by Lipscomb of the 24 shares, after the death of White, and the subsequent retirement or cancellation of said shares by the company, were without lawful warrant and void; that the said 24 shares might be declared to be the property of the estate of White, and the plaintiffs might be declared entitled to have the same to their own use, and to share ratably with the other stockholders of the company in all accumulations of property by the company since the date of said illegal transfers; that the company might be decreed to cancel said transfers and the entries thereof in its books, and to revive the said 24 shares, to enter the names of the plaintiffs in its books as the owners of the stock, and to issue and deliver to the plaintiffs a certificate of ownership for each of said 24 shares at the face value of $1000 each; that, if the revival of said stock and the transfer thereof on the books of the company into the names of the plaintiffs were impracticable, then the company might be decreed to pay to the plaintiffs the market value thereof; and for general relief.

The answer of the defendant sets forth, by way of demurrer for want of equity, that the cause of action of the plaintiffs,

and of those under whom they claim, accrued more than 35 years before the filing of the bill; that no reasonable or sufficient cause or excuse is alleged why the suit was not earlier brought, or why all the facts therein pretended to be known were not earlier discovered; that it was not shown in the bill when or how any discovery of facts alleged not to have been before known, or to have been concealed, was made by the plaintiffs, nor any diligence to ascertain the same, nor any excuse for the want of such diligence, nor any statement as to the course of proceedings or any facts connected with the administration of the estates of David White or his widow in Alabama, or as to the knowledge or acts of the legal representatives thereof in regard to the alleged rights and claims which are the subject of this suit, nor to remove the presumptions that all matters relating to the said stock, and on which the rights thereto were dependent, were fully known to said representatives; that the plaintiffs' cause of action is barred by the law of limitations of Texas and the lapse of more than 35 years since the same accrued before this suit was brought; that the suit had been delayed such great lapse of time, and parties holding the certificates of stock alleged to have been issued in renewal of those which belonged to White had many years ago obtained full value therefor in the property of the company, and the rights of third and innocent parties, as the only holders of the present alleged stock in the company, had intervened and been permitted to grow up and become of great value; and that, therefore, the plaintiffs' cause of action was barred by such lapse of time and laches, was stale and inequitable, and ought not to be heard in a court of equity.

The answer sets forth various denials of material allegations in the bill, and various alleged defences, thereto. It further sets forth that no person survives who was connected with the business or administration of the company, or who had any connection with the stock, or could be reasonably presumed to have any knowledge respecting the same.

The answer further says that the defendant pleads that suit on the matters alleged in the bill had been forborne until all persons connected with the transactions to which it related,

knowing particular facts and details in regard to said stock, and the receipt and appropriation of proceeds therefor, were dead ; and it pleads the laches, neglect and delay of the plaintiffs in bar of the suit, and alleges that the same is stale and inequitable, and ought not to be further heard or considered.

The answer further sets forth that by the statute of limitation of suits in Texas, passed in 1841 and ever since in force, all actions for personal property must be commenced and sued within two years after the cause of action accrued, all actions of debt grounded upon any contract in writing must be commenced and sued within four years next after the cause of such action or suit, and the longest period of limitation for suits or actions of any kind was ten years; that the plaintiffs' cause of action, if any they ever had, accrued more than ten years and more than thirty-five years before the filing of the bill; that said statute had not failed to be operative against the plaintiffs on account of any exception therefrom, contained therein, within the principles of equity and good conscience restraining the same. It denies all concealment, fraud or wrong charged in the bill on the part of the defendant, to prevent the running of said statute, and denies that any diligence had been shown or existed on the part of the plaintiffs, or any excuse for the lack thereof, to prevent the running of said statute; and it pleads the same as a bar to the plaintiffs' suit. It further answers that the great lapse of time, rendering impossible correct knowledge of facts at the present day, resulting from the death of all parties to the transactions, the laches of the plaintiffs, and the *bona fide* accrual of the large and valuable rights of the other stockholders in the company, render the bill a stale, inequitable, and unconscientious demand, which ought not to be heard in a court of equity; and the defendant pleads the same in bar and estoppel.

A replication was filed to the answer, proofs were taken, and the cause was heard. The Circuit Court, in November, 1886, dismissed the bill, with costs, and allowed an appeal to this court, by the plaintiffs. No written opinion was delivered, but it is stated in the brief of the appellants that the Circuit Court held that the claim could not be prosecuted, by reason

of the laches of the plaintiffs. We think there was good cause on that ground for the dismissal of the bill, and the decree of the Circuit Court must be affirmed.

David White died in December, 1841. Whatever cause of action, if any, the plaintiffs had, arose either then or in March, 1842, when Lipscomb assigned to one James Love shares of the stock. It is contended for the plaintiffs that the discovery on which their suit was based was made only a short time before 1881; but an agent was sent to Texas in 1843 expressly to obtain information. He saw Lipscomb, and obtained from the office of the Galveston City Company, in June, 1843, a full report as to the persons who surrendered the original certificates and got renewals. The report showed that the 3 certificates embraced in this suit, numbered 33, 36 and 39, were renewed to Lipscomb. It showed the fact of the renewal of 16 shares to Love. There was information enough to make it the duty of the agent to make further inquiry. In July, 1844, Robert J. Ware, executor of David White, visited Texas for the purpose of seeing Lipscomb, but did not meet him. Then ensued the period from 1844 to 1854, when no diligence was shown by the representative of White's estate. In July, 1844, administration on the estate of White was opened in Texas by W. B. Lipscomb, the son of A. S. Lipscomb. He brought a suit against Menard, claiming that the latter owed White's estate over $14,000 and interest, and that the claim was a lien on all the property of the Galveston City Company. Jones, the trustee, was made a party to the suit, and an injunction was prayed against all the operations of the company. This suit was brought with the knowledge and privity of Ware, the executor; but the administration in Texas did not assert any rights against the company, such as are asserted in the present suit. Ware visited Texas again and saw Lipscomb prior to 1854, and had an opportunity to make inquiries of the company.

In 1854, one A. F. James, as agent of David White's estate, made inquiry at the office of the company as to the rights and interest which White had in the company at the time of his death. The books, records and papers were all opened to his inspection, and the agent of the company made out for him an

historical record of White's stock. At that time, no suspicion existed of a claim against the company in the matter, and it was supposed that the search was made as the foundation of a liability on the part of Lipscomb.. Therefore, there could have been no purpose on the part of the company of any concealment. The information contained in the report of the company's agent was sufficient to put James upon inquiry.

Ware went to Texas again in 1858, when James, as his agent, made a further examination. . This was after A. S. Lipscomb had died. It appears that then, in 1858, the question arose between Ware and James as to the liability of the company to account to the heirs of White for the stock which, it was alleged, was transferred by Lipscomb after the death of White. Thus, in 1858, twenty-three years before this suit was brought, the attention of Ware was directed to the point of the liability of the company for any transfers of White's stock made by Lipscomb after White's death. Then the whole matter appears to have been dropped for eleven years, until 1869. At that time, Ware had died, and his executor, with Mr. Molton, went to Galveston in the interest of Ware's estate and of his widow; and the question arose as to a claim for the stock against the company.

On June 17, 1873, the firm of Ballinger, Jack & Mott, of Galveston, lawyers at that time employed by the company, wrote to Molton that very careful and thorough examination had satisfied them, without doubt, that the heirs of David White could not recover against the company for stock improperly transferred to others in the company's books. The matter was then dropped until 1881, when a bargain was made with a land agent of Galveston to employ counsel and bring a suit, for a contingent interest of one-half..

On all these facts, the defence of laches is sustained, on the principles established by this court. in the cases of *Stearns* v. *Page*, 7 How. 819, 829; *Moore* v. *Greene*, 19 How. 69, 72; *Beaubien* v. *Beaubien*, 23 How. 190; *Badger* v. *Badger*, 2 Wall. 87, 94; *New Albany* v. *Burke*, 11 Wall. 96, 107; *Broderick's Will*, 21 Wall. 503, 519; *Upton* v. *Tribilcock*, 91 U. S. 45; *Sullivan* v. *Railroad Co.*, 94 U. S. 806, 811, 812; *Godden*

v. *Kimmell*, 99 U. S. 201; *Wood* v. *Carpenter*, 101 U. S. 135; *Hoyt* v. *Sprague*, 103 U. S. 613; *Lansdale* v. *Smith*, 106 U. S. 391; *Philippi* v. *Philippi*, 115 U. S. 151, 157; *Speidel* v. *Henrici*, 120 U. S. 377, 386, 387; *Richards* v. *Mackall*, 124 U. S. 183, 187, 188; *Hanna* v. *Moulton*, 138 U. S. 486, 495; *Underwood* v. *Dugan*, 139 U. S. 380, 383; *Hammond* v. *Hopkins*, 143 U. S. 224, 274.

Within the rules laid down in the cases above cited, there are not in the bill sufficiently distinct averments as to the time when the alleged fraud was discovered, and what the discovery was; nor does the bill or the proof show that the delay was consistent with the requisite diligence.    On the evidence in the record, the case stood in March, 1881, when the bill was filed, on no different ground from that on which it stood in 1858, or that on which it stood from 1843, or, in fact, from the date of White's death.    Molton married a daughter of the plaintiff, Asenath A. Ware, and granddaughter of David White.    He testified that in the spring of 1869 he went to Texas as agent of the heirs of David White, especially to examine carefully into the facts of the transfers of the shares of stock which had belonged to White.

Nor is there anything which takes any of the plaintiffs out of the operation of the statutes of limitation of Texas, so as to affect the question of laches.    David White's widow was a *feme sole* from 1841 to 1853.    The plaintiff Lumpkin became of age in 1843, the plaintiff Daniel O. White in 1847, the plaintiff Clement B. White in 1850, the plaintiff Cowles in 1852, and the plaintiff Mary A. Holtzclaw in 1854.    Robert J. Ware died in 1867, and his widow since that time has been a *feme sole*.    The longest period of limitation for any cause of action in Texas, is ten years.

*Decree affirmed.*