REED v. DINGESS.

(Circuit Court, D. West Virginia. May 19, 1893.)

LAND GRANTS—FORFEITURES—REDEMPTION—LACHES.

A bill alleged that in 1796 the commonwealth of Virginia made a grant of a certain tract of land, described by metes and bounds, title to which, after various conveyances, vested in one Swan; that thereafter by virtue of several acts of assembly, the title to the tract, by reason of forfeiture of the grant, was vested in the directors of the literary fund; that by

subsequent act of assembly, passed in 1838, the title thereto was vested in one Dumas, in trust for the creditors of Swan, and free from all taxes and charges theretofore accrued, in whom and his successors in trust, duly appointed by order of court, it has ever since remained; that from the date of the creation of the state of West Virginia, within whose limits it lies, the land has never been entered on the land books for taxation, and so has become liable to be sold for the benefit of the school fund; that parts of said land have been sold as "waste and unappropriated" in proceedings by the commissioner of school lands, but that they were not of that character, and hence that the proceedings were void; that complainant, the successor of the trustees therein mentioned, and the holder of the legal title, had the absolute right to redeem, which could only be divested by proper proceedings under the law of West Virginia to sell for the benefit of the school fund, which proceedings have never been had; and it prayed that complainant be allowed to redeem, etc. The bill was not filed until 1893. It failed to show that the trustees had ever done anything in furtherance of the trust, or to allege any excuse for their neglect; and it failed to show who were the creditors or representatives, if any, of Swan, or what interests they had. *Held,* that complainant and his predecessors in the trust had been guilty of such gross laches as to bar all their rights in the premises, and the bill must be dismissed.

In Equity. Suit by John R. Reed, trustee, etc., against Zatto C. Dingess. Bill dismissed.

J. S. Clark, Z. T. Vinson, and E. L. Butterick, for plaintiff.

N. Dubois Miller, J. Rodman Paul, Biddle & Ward, James H. Furgerson, and J. F. Brown, for defendant.

GOFF, Circuit Judge. John R. Reed, a citizen of the state of Pennsylvania, brings this suit against Zatto C. Dingess, a citizen of the state of West Virginia. It is alleged in the bill that the commonwealth of Virginia on the 21st day of January, 1796, granted unto William McClery a tract of land containing 100,000 acres, situated on the waters of Coal, Sandy, Tug, and Guyandotte rivers, in the state of Virginia, now in West Virginia. The land is described by metes and bounds, from a survey dated the 21st day of May, 1795. It is set forth that on the 22d day of January, 1796, the patentee, William McClery, conveyed the entire tract of land to James Swan, by deed of that date, duly executed, and subsequently recorded in the proper office in Logan county, where the greater part of the tract was situated. The bill then shows that it appears by the records of the court of appeals of the state of Kentucky that James Swan made and executed, in the city of Paris, France, a deed of conveyance for 43-48 parts of this tract of 100,000 acres of land, (as well as of other lands owned by him, situated in the states of Virginia and Kentucky,) dated November 22, 1819, to David Cowper Swan, Charles William Juste Jerome, and Louis Philibert Brun d'Aubigne, trustees, for certain purposes in the conveyance mentioned, a copy of which deed is filed with the bill; but the validity of the same, as well as the proper recordation thereof, is denied by the complainant. The bill then charges that the trustees mentioned in such alleged deed executed a mortgage on the lands described in it, which is also dated November 22, 1819, by which they secure the payment to James Swan of the sum of

$804,166.67, the same being, it is charged, the deferred payments of purchase money due to Swan for said lands, and a certified copy of such mortgage from the records of the court of appeals of Kentucky is filed and made part of the bill. It is then set forth that the purchase money was not paid, and that proceedings were instituted by James Swan et al. in Paris, France, in the year 1824, for the recovery of said money, and the dissolution of the company for which the trustees mentioned held the land under the deed of 1819, and that in the year 1827 a decree was entered in such proceedings dissolving the company, and placing its affairs in the hands of a notary for liquidation, a copy of which decree is also filed and made part of the bill. Complainant then alleges that under and by virtue of several acts of the general assembly of Virginia the title to the tract of 100,000 acres of land, by reason of forfeiture, became vested in the "president and directors of the literary fund" of the state of Virginia, and that on the 15th day of March, 1838, such forfeiture being then in force, the general assembly passed an act by which the title to said tract of land was transferred to and vested in one John Peter Dumas, in trust, discharged from all taxes and damages chargeable thereon before the 1st day of January, 1838; that John Peter Dumas, as trustee, held the land until his death, in December, 1847; and that the circuit court of Kanawha county, Va., in certain proceedings pending before it, on the 1st day of June, 1855, appointed Josiah Randall, of Philadelphia, Pa., as trustee in the place of Dumas. That Josiah Randall acted as such trustee until his death, in 1866, and that Robert E. Randall was, on the 3d day of October, 1866, by the same court, appointed to succeed Josiah Randall in such trust, and that he continued to act as such until the 29th day of June, 1886, when he resigned, and the complainant, John R. Reed, of Philadelphia, was on that day appointed trustee of the James Swan estate in the room and place of Robert E. Randall, such appointment being then made by an order entered in the chancery cause of Emile and Charles Dumas v. D'Huc D'Monsignor et al., then pending in the circuit court of the United States for the district of West Virginia, at Parkersburgh.

The bill then charges that the tract of 100,000 acres of land was not charged on the land books of Logan county to John Peter Dumas, from the year 1840 to the year 1860, as a tract of 100,000 acres, but that in the year 1840 he was so charged in that county with a tract of 83,074 acres, which complainant says is that part of the said tract of 100,000 acres that was located in such county; and he says that it was so on said land books for the years from 1840 to 1856, inclusive, and that the taxes due upon it were paid up to and including the year 1854, but that such tract of 83,074 acres was not charged to Dumas from the years 1857 to 1860, inclusive. It is set forth in the bill that the tract of 100,000 acres has not, nor has any part of it, been entered on the land books, either in the name of John Peter Dumas, Josiah Randall, Robert E. Randall, or John R. Reed, the complainant, since the creation of the state of West Vir-

ginia, and that by reason of the failure to cause the same to be so charged for taxes the lands, under the provisions of the laws of West Virginia, became liable to be sold by the commissioner of school lands for Logan county, for the benefit of the school fund; and that such official during the years from 1882 to 1888, inclusive, did sell certain portions of the same to the defendant, at public sale, as waste and unappropriated lands. It is also stated that at the April term, 1882, of the circuit court of Logan county, W. Va., one L. D. Chambers, commissioner of school lands for that county, filed his petitions as such officer in that court, representing to the court that there were five tracts of land on Dingess' Run creek and its waters in Logan county, containing certain quantities, respectively, as set forth in his petitions, and that the same was "waste and unappropriated lands," to which no person claimed title; that under and in pursuance of the petitions, and at the same term of the court, an order was made directing said tracts of land to be sold as "waste and unappropriated lands" for the benefit of the school fund, no person claiming title thereto; that the same were duly sold by the commissioner on the 28th day of August, 1882, and purchased by the defendant, he being the highest bidder, which sales were duly confirmed by the court, and the commissioner ordered to make to the defendant deeds for the lands so sold to him, which was done, and the deeds duly recorded. The complainant then charges that at different times the school commissioner reported to the court mentioned as land waste and unappropriated various parts of the 100,000-acre tract, and that such orders were made in the proceedings then so pending, at different times, as resulted in the sale of many portions of the same, and the purchase thereof by defendant, the sales all being confirmed by the court, and deeds made for the land. The first of such sales was so ordered at the April term, 1882, and the last at the July term, 1888, and the number of acres sold was 5,904.

The bill claims that there is no land in West Virginia that is "waste and unappropriated," except such as has never been granted by the commonwealth, and that the tracts of land so sold were not "waste and unappropriated," but were parts of the 100,000-acre tract that had been granted to William McClery in the year 1796, now claimed by complainant, as trustee of the James Swan estate. It is also alleged that the reports so made to the circuit court of Logan county by the school commissioner were untrue.

The complainant claims that under the constitution and laws of the state of West Virginia he has the absolute right to redeem the tract of 100,000 acres of land so forfeited, and that his right to redeem can only be divested by proceedings to sell the land for the benefit of the school fund, in conformity to the law providing for such sales; and no such proceedings, he claims, have ever been instituted. He alleges that all the proceedings brought in the circuit court of Logan county by the school commissioner, including the decrees of sale and orders made confirming the same, as well as the deeds executed and delivered to the defendant, are without au-

thority of law, and void, and should each and all of them be set aside and annulled; that defendant purchased such lands with full knowledge of complainant's title, and that the commissioner proceeded against it as "waste and unappropriated" for the express purpose of defeating the right of redemption held by complainant, instead of charging it as land delinquent and liable to be sold for failure of the owner for five years to have the same entered on the land books,—a proceeding in which complainant claims it would have been proper for him or his predecessor in trust to have filed a petition to redeem. The prayer of the bill is that the several deeds made to defendant for the lands so purchased by him be canceled, and that complainant be put in possession of the land mentioned and described in them, and for general relief.

The defendant has filed a demurrer to the bill, assigning numerous grounds of insufficiency of and want of equity in the same. Defendant insists that from the allegations of the bill it appears that complainant has no title to the 100,000 acres of land; that it does not appear that James Swan died seised of it; that it is shown that the title to the land was forfeited, and never redeemed or relinquished; that complainant, as trustee, was never invested with the legal title to the land; and that it appears from the bill that a court of competent jurisdiction, in a case properly before it, decreed the sale of the land now claimed by defendant, the decrees of sale not being reversed, but still being in force, and that, therefore, their legality cannot be questioned in a collateral proceeding.

In the view that I take of this case it will not be necessary to consider the complainant's title to the land mentioned, nor discuss the question of jurisdiction in the sense that it is suggested in the demurrer. The complainant seeks the aid of a court of equity. He appeals to conscience for relief. Before the aid asked can be given and the relief prayed for be granted, such a state of facts must be presented as will enable the court to see that the complainant and those preceding him in trust have themselves acted as in "justice and fair dealing" they should have done, and that they have not refused or neglected to so assert and protect their claims, as, in connection with lapse of time and other circumstances, will work prejudice to others, and operate as a bar to the relief now asked. Courts of equity universally refuse their aid in behalf of stale demands, and no doctrine is now more general and more useful, when properly applied, than that of laches. Judge Moncure, delivering the opinion of the court in Doggett v. Helm, 17 Grat. 96, said:

"The court is of opinion, without deciding any other question in this cause, that laches and lapse of time afford a sufficient ground for affirming the decree of the court below, dismissing the plaintiff's bill. It is an inherent doctrine of courts of equity to refuse to interfere where there has been gross laches in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights. 2 Story, Eq. Jur. § 1520. As was said by Lord Camden in Smith v. Clay, Amb. 645: 'A court of equity, which is never active in relief against conscience or public convenience, has always refused its

aid to stale demands, where the party has slept upon his right, and acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced.' This doctrine of courts of equity has been always recognized and acted on, and these observations of Lord Camden have been often repeated and approved by the courts of England and this country."

The supreme court of appeals of Virginia, of West Virginia, and the supreme court of the United States, have repeatedly announced this rule, as the following cases will demonstrate: Carr's Adm'r v. Chapman's Legatees, 5 Leigh, 164, 171; Hayes v. Goode, 7 Leigh, 452; Pusey v. Gardner, 21 W. Va. 469; Trader v. Jarvis, 23 W. Va. 100; Piatt v. Vattier, 9 Pet. 405; McKnight v. Taylor, 1 How. 161; Wagner v. Baird, 7 How. 234; Badger v. Badger, 2 Wall. 87; Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. Rep. 610. I cite the following cases in which the subject is discussed, and the same conclusion reached: Kane v. Bloodgood, 7 Johns. Ch. 93; Decouche v. Savetier, 3 Johns. Ch. 190; Johnson v. Diversey, 82 Ill. 446; Liverpool Royal Bank v. Grand Junction Railroad & Depot Co., 125 Mass. 490; Shorter v. Smith, 56 Ala. 208; Harlow v. Iron Co., 41 Mich. 583, 2 N. W. Rep. 913; Spaulding v. Farwell, 70 Me. 17; Sargeant v. Bigelow, 24 Minn. 370; Hume v. Long, 53 Iowa, 299, 5 N. W. Rep. 193; McCoy v. Poor, 56 Md. 197; Pipe v. Smith, 5 Colo. 146; Walet v. Haskins, 68 Tex. 418, 4 S. W. Rep. 596; Smith v. Thompson, 54 Amer. Dec. 126. The English courts announce the same conclusion. Cholmondeley v. Clinton, 2 Jac. & W. 1; Beckford v. Wade, 17 Ves. 87; Bonney v. Ridgard, 1 Cox. Crim. Cas. 145; Sherrington v. Smith, 2 Brown, Parl. Cas. 62.

This doctrine has lately been reviewed, and is strongly and most aptly expressed by Mr. Justice Brewer in Naddo v. Bardon, 2 C. C. A. 335, 51 Fed. Rep. 493:

"No doctrine is so wholesome, when wisely administered, as that of laches. It prevents the resurrection of stale titles, and forbids the spying out from the records of ancient and abandoned rights. It requires of every owner that he take care of his property, and of every claimant that he make known his claims. It gives to the actual and longer possessor security, and induces and justifies him in all efforts to improve and make valuable the property he holds. It is a doctrine received with favor, because its proper application works out justice and equity, and often bars the holder of a mere technical right, which he has abandoned for years, from enforcing it, when its enforcement would work large injury to many."

Every person is bound to take care of his own rights, and equity is no more bound to take care of those who can take care of themselves, and will not, than is the law.

The plaintiff's bill shows that the trustees who in law represented the Swan title, in fact gave it but little representation, and that their delay in asserting it has been unusual and long-continued. What excuse is given for conduct on their part that, in the absence of explanation,—without some extenuating circumstances by or for them specially pleaded and sustained,—must be regarded as carelessness so gross that it is most reprehensible, provided they had faith in their title, and believed it worthy of protection by

honest endeavor on their part? James Swan, John Peter Dumas, Josiah Randall, and Robert E. Randall were all, as the bill and exhibits disclose, and as is conceded in the history of the days in which they lived, men of character, education, and experience in business matters, all well advised as to the requirements of the law, and familiar with its demands upon them as landowners and as trustees, yet all of them, if the plaintiff's claims are well founded, for many years failing and refusing to perform their duties. In all the bill I find no reason given—no excuse offered—for their at least strange management of an equally strange trust. Who are the parties entitled to this trust fund? What are their respective interests? Where do they reside? And why have they not been heard from during the last half century? The bill is silent as to these matters, the records filed as exhibits make no disclosures relating thereto, and so the questions will remain unanswered.

There seems to have been but little attention given the land in controversy from the date of the grant in 1796 down to the institution of proceedings in Logan county, in 1882, to sell it for the benefit of the school fund. The day after it was patented to William McClery—January 22, 1796—it was conveyed by him to James Swan. It does not appear that he ever had actual possession of any portion of it, but it does appear that he permitted the entire tract to become forfeited for the nonpayment of the taxes due thereon. It seems that in 1819 he conveyed it—or supposed he had done so—to certain trustees, who conveyed it for certain trust purposes, and that afterwards, in 1838, the general assembly of Virginia vested such title as was not then vested in others than those claiming under Swan in John Peter Dumas, in trust for the use and benefit of the creditors of said Swan. I do not find from the record that John Peter Dumas, as such trustee, exercised any care or control over any of the land now in controversy after the year 1854, if in fact he ever did. It is not clear that any part of the 100,000 acres was entered on the land books in Virginia after the passage by the general assembly of that state of the act of 1838. It is certain that none of this land has ever been on the land books in West Virginia in the name of James Swan, or of any of his trustees. The irresistible conclusion is not that the trustees did not know their duty, not that they willfully failed to do their duty, but that they concluded they had no valid title to protect, no land to enter on the land books, and no taxes to pay. Their long and continued acquiescence in the abandonment of the land is susceptible of but one inference consistent with honest deportment on their part, and that is, they considered that their cestuis que trustent were without interest in it. Whether they so acted and concluded as to all the different tracts of land included in the Dumas trust the record does not advise, nor is it material, as we are now considering only the McClery grant of 100,000 acres.

The state of West Virginia was created in 1863, and at that time there was no law of the state of Virginia under which lands were

forfeited for the failure of the owners thereof to enter them on
the land books, and charge them with taxes.    In 1869 such a law
was enacted by the West Virginia legislature, and by it the owner
of lands not so entered and charged was given one year from its
passage in which to enter and so charge his lands, and thereby
save their forfeiture.    This provision of the act of 1869 was after-
wards incorporated into the constitution of the state of West
Virginia, as adopted in 1872, and is the sixth section of article
13 thereof.    With full knowledge of this legislation and of this
constitutional provision Robert E. Randall, trustee, appointed as
such in 1866, permitted the time to pass in which he could have
placed this land on the land books, if he then had title to it, and
thereby have prevented its forfeiture.    He did not avail himself of
this provision of the law.    He adopted the same policy of non-
action, so far as this land is concerned, that John Peter Dumas
and Josiah Randall, former trustees of the same, did.    For 20
years Robert E. Randall was such trustee, and for all those years
his record as such is a blank, relative to this land.    He then re-
signs, and the plaintiff was appointed on the 29th day of June,
1886, to succeed him as trustee.    It will be observed that the pro-
ceedings instituted by the school commissioner of Logan county
to sell the lands for the benefit of the school fund had been pend-
ing over four years when the plaintiff was so appointed, and that
it was over four years after his appointment when this suit was
commenced.    But it is proper to say in this connection that the
present trustee, so far as his duties as such and the question of
laches is concerned, does not occupy the same position as do his
predecessors in trust; and it is also proper to note that, since they
have ceased to act as trustees, and since he has qualified, a great
change has taken place in the section of country where this land
is located that very materially enhances the value of the property
now claimed as part of the trust estate.    On account of the recent
development of Logan county by the construction of railroads,
and the consequent opening of her valuable mineral and timber
regions to the markets of the country, the commercial value of the
land therein has been enormously increased, and the great demand
for the same has tended to revive titles that had been for years
apparently abandoned.    But constitutional provisions have de-
prived long-neglected grants of the efficacy they once possessed
as muniments of title, and legislative enactments that breathe
the spirit of the progress now typified by the change I have men-
tioned have made the "waste and unappropriated" places of former
days the garden spots of our present industrial prosperity, and have
caused the lands that were "forfeited" to become the most valuable
of all the domain of the state.

    The books tell us that courts of equity will not close their eyes
to these matters, and the cases bearing on the doctrine of laches
say that it is the duty of the judge to consider them, and that fre-
quently they will explain the activity existing in connection with
demands that have long been dormant.    I do not find from any of

the decisions that it is the duty of a court of equity to provide the stimulus that will impart new life to the vapid claims which only present themselves for recognition under the revivifying influences of the eras of development alluded to.

Plaintiff's bill is ably and adroitly drawn, telling in an interesting manner a wonderful story, and illustrating the peculiar vitality. said to be inherent in the early Virginia land grants. The plaintiff claims the legal title to 100,000 acres of land patented to William McClery in 1796. He claims for the creditors of James Swan over 150 square miles of the territory of West Virginia, —nearly one-fourth of the area of Logan county,—and in making his claim he admits his inability to prove that any part of the land was ever entered on the land books of Virginia, the state that granted it; and he concedes that none of it has ever paid taxes under the title he claims by to West Virginia, the state that now includes it in her boundaries. Yet it is history that during all these years Virginia, from 1796 to 1863, and West Virginia from the year of her creation down to the year in which this suit was instituted, endeavored to collect revenue from all such grants of land. It is claimed that all forfeitures and delinquencies occurring prior to the year 1838, relating to the land in controversy, were released by legislative enactment, and that it is stated in the release that the taxes and damages then due amounted in the aggregate to so great a sum of money that the creditors of Swan had better abandon the land than pay it. If that was the situation in 1838, what was the condition of affairs in 1870, when the trustee refused to comply with the requirements of the legislation of the state of West Virginia before mentioned? The presumption is that he best served the interests of those he represented when he declined to pay the taxes, and abandoned the land. And what was the status quoad this matter at the date of the bringing of this suit? The bill admits that taxes for many years are in arrears. It does not claim that they have been released, nor does it proffer to pay them. It is clear that the trustees of the Swan lands have slept upon such rights as they had; that they have delayed unreasonably the assertion of their claims; that they have nothing to offer in explanation or in mitigation of their conduct; that they in effect ask to be rewarded for their neglect of duty, and that a premium be paid them for the wrong they have done; that they have neglected the provisions of legislative enactments, and ignored constitutional requirements; that they have been indifferent to the interests of the state, and have not borne their share of the burdens of the county. They have not done equity, and equity will not now do violence to her rules at their demand. I will pass a decree sustaining the demurrer and dismissing the bill.