## MARTIN et al. v. BROWN et al.

(Circuit Court of Appeals, Eighth Circuit. December 10, 1923.)

No. 6300.

1. **Appeal and error ☞1042(2)—Sustaining motions to strike held harmless.**
   Sustaining motions to strike matter from bill was harmless, where all material matters were covered and included in the remaining allegations, sufficiently to have let in all testimony which might have been admissible under the stricken allegations.

2. **Equity ☞133—Pleader not bound to state evidence or anticipate defenses.**
   The pleader in a bill of equity is not bound to state either the testimony or facts which militate against his theory, but only to present his case in the light most favorable to his own interests, and ask that, on such presentation, the court shall decide on the sufficiency of his bill.

3. **Appeal and error ☞866(1)—Inquiry on review of order of dismissal stated.**
   Where the trial court dismissed the bill as not stating a cause of action, the appellate court must decide whether the defects in the bill, if any, are fatal and extend to the pleading as a whole.

4. **Wills ☞741—Bill of complaint by heirs against other heirs held sufficient.**
   Bill by younger sisters against their older brothers and others, alleging that the brothers, who were father's executors, fraudulently induced plaintiffs, who were inexperienced in business, to join in the execution of a contract providing for the transfer of the father's business to a corporation to be organized by such brothers and others, *held* not vulner-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

able to a motion to dismiss as not stating a cause of action, nor to a motion to dismiss as to others than the brothers; such others, in view of the complex transactions alleged, being proper, if not necessary, parties.

Lewis, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Colorado; John Foster Symes, Judge.

Suit by Alice Brown Martin and another against Frederick Sidney Brown and others. Motions to strike matter from the bill and to dismiss were granted (282 Fed. 717), and plaintiffs appeal. Order granting motions to strike affirmed, and order of dismissal set aside, and case reinstated as to all defendants named.

T. J. O'Donnell, of Denver, Colo., for appellants.

T. H. Devine, of Pueblo, Colo. (J. W. Preston and Todd C. Storer, both of Pueblo, Colo., on the brief), for appellees J. S. Brown Mercantile Company, J. S. Brown Grocery Company, Shields-Metzler Grocery Company, Franklin T. Metzler, John O. Spicer, James M. Metzler, and William H. Parry.

Henry C. Vidal, of Denver, Colo. (George L. Hodges and William V. Hodges, both of Denver, Colo., on the brief), for appellees J. S. Brown & Brother Mercantile Company, Frederick Sidney Brown, J. Sidney Brown, Carroll Teller Brown, William Knight Brown, and Edward Newton Brown.

Before STONE and LEWIS, Circuit Judges, and VAN VALKENBURGH, District Judge.

VAN VALKENBURGH, District Judge. It appears from the bill that in July, 1893, the J. S. Brown & Brother Mercantile Company was incorporated under the laws of the state of Colorado. This corporation succeeded to the business of J. S. Brown & Brother, wholesale grocers at Denver, Colo., a copartnership conducted by J. Sidney Brown and his brother Junius Flagg Brown. At the time of the incorporation the said John Sidney Brown appears to have been the sole owner of said business and the corporate stock of the corporation which succeeded the partnership. John Sidney Brown died on the 15th day of January, 1913, leaving surviving him Adele Overton Brown, his widow, and nine children. The plaintiffs Alice Brown Martin and Irene Brown Black and the defendants J. Sidney Brown and Carroll Teller Brown were children of the said Adele Overton Brown. The defendants Frederick Sidney Brown, William Knight Brown, and Edward Newton Brown, together with one Katherine Brown Johanson and one Elizabeth Brown Inglis, not parties to this proceeding, were children of the said John Sidney Brown by a former wife.

By his will John Sidney Brown bequeathed his property to his widow and children, and named his widow and the defendants Frederick Sidney Brown and J. Sidney Brown as his executors. In his will he expressed the wish that the stock and notes of the corporation standing in his name should be partitioned among his heirs, upon which they should receive the income respectively from their holdings for a period of five years. On or about the 19th day of July, 1913, the heirs of John Sidney Brown filed in the county court for the city and county

of Denver, having probate jurisdiction, their petition, of too great length to be set out in full in this opinion, praying authority to form a corporation with an authorized capital stock of·$1,500,000, to take over the title to all of the said wholesale grocery and jobbing business, including the stock of goods, wares, and merchandise, bills receivable, and accounts receivable relating thereto, then belonging to the said J. S. Brown & Brother Mercantile Company, with the exception of certain accounts receivable·of the value of $150,000, to be determined, selected, and set aside by the executors of said estate, and to be otherwise disposed of. This was done for the stated purpose of segregating the said wholesale grocery business and property pertaining thereto from the other business and property of the decedent. As a consideration for the conveyance and delivery of said property to the new corporation, and in exchange therefor, the said J. S. Brown·& Brother Mercantile Company was to receive $400,000 of the par value of the preferred capital stock of said corporation, and $350,000, par value, of the common capital stock of said corporation; said preferred stock and said common stock each amounting to $750,000 of the total capital of $1,500,000. The J. S. Brown & Brother Mercantile Company was also to sell $250,000 of said common capital stock of the corporation to be formed, and also to sell $150,000 of the accounts receivable which had been reserved from the transfer to the new company as hereinabove set out; all upon such terms and conditions as the executors might deem best for the best interests of the estate. For the $250,000 of stock of the said J. S. Brown & Brother Mercantile Company and the $150,000 of accounts receivable, to be sold as last aforesaid, J. S. Brown & Brother Mercantile Company were to receive $100,000 in cash and $150,000 in promissory notes payable in installments over a period of five years; the same to be secured by the common stock of the new company. It is unnecessary to consider more in detail the other provisions of the petition.

On the 2d of August, 1913, the prayer of the petitioners was granted by order of the county court. This petition was signed by the plaintiffs in this action. At that time Alice Brown Martin was married and a resident of Seattle, Wash.; the plaintiff Irene Brown Black was unmarried and living with her mother. It is alleged in the bill that neither of the plaintiffs understood the purport of the transaction, but relied entirely upon the representations, particularly of their elder brothers, defendants herein, who exercised a dominating influence in the affairs of the family, and upon whose representation that the step taken was for the best interests of all concerned they implicitly relied. It is stated also that the mother, who was at that time living and had been named as president of the J. S. Brown & Brother Mercantile Company, was likewise unversed in business affairs and was under the same dominating influence and control. In the petition filed with the county court the full nature of the contemplated change was not stated. It was evident, of course, that new capital and other parties were to be brought in through the agency of the new corporation, but the names of such parties and the extent of their control was not stated.

The bill charges that the purpose of this reorganization was, in effect, to shift the management and control of the business of the J. S. Brown

& Brother Mercantile Company from the defendant members of the Brown family, in return for which such defendants made transfers of this portion of the estate at a sacrifice and for an inadequate consideration, and were themselves to receive certain disproportionate advantages, interests, and returns as compared with their coheirs, and particularly these plaintiffs, and were to enjoy certain emoluments in the way of salaries and otherwise in the management of the residue of the Brown estate, to the disadvantage and to the loss of plaintiffs; that this was known to those of the defendants characterized in the bill as the Metzler party, to wit, Franklin T. Metzler, John O. Spicer, James M. Metzler, and William H. Parry, who participated with the said defendants of the Brown family in thus perpetrating what is, in effect, alleged to be a fraud upon the plaintiffs. The defendant Edward Newton Brown is practically exonerated from this charge, because he is alleged to be in a measure irresponsible, and the bill prays relief in his behalf as well as for the plaintiffs. The defendant German-American Trust Company is a mere formal, although necessary, party, because made a trustee with power to hold and vote certain shares of the common stock transferred and delivered to it. The defendant the Shields-Metzler Grocery Company of Colorado Springs, owned or controlled by the Metzler party, is charged with participation and as having been made an instrumentality in the furtherance of the project. The defendant the J. S. Brown Mercantile Company is the new company organized pursuant to the prayer of the petition filed with the county court, in which the so-called Metzler party, consisting of the individuals above named, and the defendants of the Brown family, with the exception of the defendant Edward Newton Brown, are in corporate control, and to which the business of the old J. S. Brown & Brother Mercantile Company has been transferred, as aforesaid. In the latter company the defendants of the Brown family, together with Franklin T. Metzler, are in control as officers and directors.

At a later period the defendant J. S. Brown Grocery Company, of Pueblo, Colo., was organized, apparently as a branch and subsidiary of the J. S. Brown Mercantile Company: the stock holdings and commercial transactions of the two companies, and indirectly of the J. S. Brown & Brother Mercantile Company, being interlaced and interdependent.

It is charged in the bill that the defendants of the Brown family, in control of the affairs and remaining property of the J. S. Brown & Brother Mercantile Company, have voted to themselves salaries, and have credited themselves with expenses and distributions, largely disproportionate to the services required in view of the transfer of the substantial business of the company to the new corporation, and to the disadvantage of complainants; that in substance the conduct of the business of the affairs of the John Sidney Brown estate, through the transactions to which reference has been made, as alleged in the bill, discloses, and will, upon hearing, more fully disclose, not only waste in management, but a deliberate plan in the nature of a conspiracy to administer the estate to the personal advantage of the defendants and at the expense and loss of these petitioners. The petitioners, therefore, pray an accounting and for such other and further relief as the ulti-

mate facts may justify. The foregoing is a fair statement of the intendment of the bill, omitting unnecessary reference to incidental matters pleaded largely by way of inducement and with the evident purpose of fortifying and justifying the claims of the petitioners.

[1] The defendants filed motions to strike various paragraphs, clauses, and phrases from the bill. These motions were sustained. This action of the trial court requires no consideration at our hands. It is conceded that the bill contains much repetition, and it is evident that many clauses of the bill were vulnerable to such motions. However, it was conceded at the argument that the bill, as it remained after the motions to strike were sustained, contained the entire substance of the charges originally made. In their brief counsel for appellees said:

"As to practically everything stricken from the bill, whatever could possibly have been material was sufficiently covered and included in allegations remaining in the bill to have let in all the testimony that might have been admissible under the stricken allegations. In fact, if any causes of action were stated, as to appellees whose motion to strike was sustained, enough remains in the bill to charge them with liability. The rulings, therefore, as to redundant allegations, the substance of which remains in other parts of the bill, could not possibly have prejudiced appellants."

The motion to strike, therefore, and the parts stricken, need be given no further consideration.

Appellees, defendants below, also filed their several motions to dismiss the bill upon many grounds therein stated; the main ground, and the only one upon which the court acted, as disclosed by its opinion, being that no cause of action was stated against certain of the defendants, to wit, the J. S. Brown Mercantile Company, the J. S. Brown Grocery Company, the Shields-Metzler Grocery Company, Franklin T. Metzler, John O. Spicer, James M. Metzler, and William H. Parry. The motions to dismiss were sustained as to all the above-named defendants except Franklin T. Metzler, and plaintiffs were given 30 days to amend their bill in accordance with equity rule 20, in default of which the bill was to be dismissed. At the expiration of that time, the plaintiffs having elected to stand upon their bill of complaint and declining to plead further, the bill was finally dismissed.

From the foregoing it will be seen that practically the sole question before the court is to determine whether the bill, as it finally stood, stated a cause of action, and whether the defendants, in whose favor the order of dismissal was made, were proper parties thereto.

[2] In approaching this question we have recourse to the principle announced by the Supreme Court in Townsend v. Vanderwerker, 160 U. S. 171, 186, 16 Sup. Ct. 258, 263 (40 L. Ed. 383):

"There are doubtless circumstances in the case which indicate at least a difficulty of proof, if not to arouse a suspicion, that perhaps the plaintiff may have overstated his case, but the pleader in a bill in equity is not bound to state either the testimony or facts which militate against his theory, but only to present his case in the light most favorable to his own interests, and ask that, upon such presentation, the court shall decide upon the sufficiency of his bill."

[3] We must decide whether the defects in the bill, if any, are fatal and extend to the pleading as a whole. Jack v. Armour & Co. (C. C. A.) 291 Fed. 743.

[4] It is clear that even in the mind of the trial court a cause of action was stated against some of the defendants; that the bill was not fatally defective in its entirety. He says:

"In regard to the first group of defendants, with the exception of Franklin T. Metzler, the situation is different. On account of the relationship existing between them, the defendants' conduct (which would not necessarily be objectionable in the absence of such relationship) may very properly be deemed fraudulent, if established. They occupied the position, with respect to their two sisters, of executors, older brothers, and confidential advisers; and it is charged knew at the time of the death of their father that they, the plaintiffs, had had no business experience, and had every reason to rely with full confidence upon their judgment and advice.

"The defendant Franklin T. Metzler, although a stranger to the plaintiffs, and occupying no relation of trust toward them, became, according to the bill, after the execution of Exhibit A, a director of the J. S. Brown & Brother Mercantile Company, and was actively associated with the first group of defendants in the alleged mismanagement of the affairs of the defendant the J. S. Brown & Brother Mercantile Company. The bill, therefore, as to him, will not at the present time be dismissed."

It is manifest that the requirement that plaintiffs should amend their bill was made pursuant to that part of the motion to dismiss which was sustained by the court. Under the equity rules motions to dismiss now perform the office of demurrer under the former equity practice. Motions to strike parts of a bill do not, and should not, perform that office; if sustained, the parts stricken are removed from consideration, without more. In equity they are brought to the attention of no one but the chancellor, who has passed upon them in considering the motions to strike, and therefore are without further prejudicial effect. It is necessary, therefore, to consider the bill under the motions to dismiss as upon demurrer.

It is conceded by appellees that the parts stricken out constituted, in effect, mere surplusage and unnecessary amplification of the main charge; that all contained therein, so far as it was or might be material, remains in the bill, and therefore that, if a cause of action was originally stated, it still remains. This is, in effect, the finding of the trial court in refusing to dismiss the bill in the first instance as to several defendants. The chief complaint of appellants is the dismissal as to others of the defendants, and the final order of dismissal as to all defendants because of refusal to amend the bill by leaving out the defendants thus originally dismissed out of court by the trial judge. It is true that the court complained of certain statements of law, argumentative expressions, and allegations of mere business transactions, the wisdom of which "it is not proper for the court to pass upon;" but these are not specified with such particularity as would advise the pleader what amendment should be made in such respects. It does not, therefore, appear that the court dismissed the bill for such general and unexplained faults. It is true that appellees attack the bill as multifarious, and as joining several different grounds for relief, criticized as not affecting all parties to the litgation, and some as not entitled to be considered upon the facts stated; but the trial court did not indulge these attacks, and did not found its ruling thereon. Certainly it did not point out requirements for amendment with sufficient clearness to enable appellants to remedy the alleged defects, even if so

inclined. It would seem, therefore, that this court, as a practical matter, is confined to a consideration of whether a cause of action was stated against those defendants as to whom the motions to dismiss were sustained. As above stated, the trial court itself concedes that there is merit in the bill, and that it states a cause of action against the defendants over whom jurisdiction was retained. The situation is not one where no cause of action is stated.

It is alleged in the bill that the defendants in whose favor the order of dismissal was originally made were all parties with the remaining defendants in the various transactions, exchange of properties, and reorganization, of which complaint is made. They received interests and benefits flowing therefrom. It satisfactorily appears from the allegations that what was done was done as part of a plan of which all the parties must necessarily have had knowledge and understanding. Furthermore this express allegation is found:

"And the plaintiffs expressly charge the defendants Franklin T. Metzler, John O. Spicer, James H. Metzler, William H. Parry, and the Shields-Metzler Grocery Company were participants in the fraud by which the business and property of the J. S. Brown & Brother Mercantile Company was transferred and turned over to the J. S. Brown Mercantile Company as herein stated, and that the said last-named defendants and all of them should likewise be held to account to the J. S. Brown & Brother Mercantile Company for all loss and damage which the last named company suffered by reason of such fraud, disposition, and transfer; and the plaintiffs further allege that the J. S. Brown Mercantile Company was organized for the express purpose of being a beneficiary of the fraud so perpetrated."

The trial court expressly finds that the defendant Franklin T. Metzler sustained such a relationship to the transaction that he must be retained as a defendant in the case, but the allegations of the bill involve equally the other Metzler defendants named.

But, even though the allegations did not point convincingly to the active participation of such dismissed parties in an unlawful attempt to gain undue advantage over the complainants, nevertheless the interests of all parties defendants, in the properties involved and in the complex transactions affecting those properties in their various changed forms and relations, are so interlaced and interwoven that a disentanglement and readjustment in accordance with the prayer of the bill would be impossible, without affecting the property rights and holdings of each. Even though some of the parties could not be personally charged with affirmative fraud, nevertheless the fact that they are alleged to be recipients and holders of stock and other property rights in the allied companies, would make them proper, if not necessary, parties to any readjustment and marshaling of the assets involved. They should therefore be retained in the case for this reason if for no other.

It may be freely conceded that this bill is unduly prolix, and contains much repetition and duplication of statement. This vice makes it confusing and embarrassing to a chancellor, and this type of pleading is condemned. The order of the court, however, does not have the effect of dismissing the bill upon that ground, and the spirit of equity requires, in the absence of substantial violation specifically pointed out, that where a bill states, even imperfectly, a cause of action which is recognized by the court in its findings, a complainant should not be

foreclosed of the opportunity to establish such right to relief as his bill may justify, even though that be less than the full measure prayed.

This bill sounds primarily and in the last analysis in a charge of fraud and overreaching on the part of the older brothers of complainants, in which the other defendants not so related have contributed and participated in some degree. It is charged that certain of the defendants made knowingly and purposely an unwise and improvident disposition of the father's estate, with the intent and purpose of gaining personal benefits to the disadvantage of the complainants; that this was a breach of trust and confidence, the consent to which was brought about, if not by active misrepresentation, then by tacit deceit practiced and accomplished through the relationship of trust and confidence existing; that since the original transfer of a large part of the assets of the original company for an inadequate consideration, the family defendants, at least, have enjoyed special benefits and pecuniary gain, to the disadvantage, or at the expense, of the complainants, to such extent and in such manner as to amount to a breach of the trust and confidence existing between them. It is unnecessary to do more than generalize upon the intendment of the bill. It may very well be that the charges made cannot and will not be substantiated; that it may develop, upon hearing, that complainants are estopped from being accorded the relief in whole or in part to which they lay claim; but this court cannot anticipate such a result, particularly when the trial court upon the face of its ruling concedes that a case is stated against some of the defendants, when such finding is sustained by the allegations of the bill, and when it appears that all of the defendants are at least proper, if not necessary, parties to a determination of the full extent of the relief which may flow from the cause of action stated.

It follows from what has been said that the order of dismissal should be set aside, and the cause reinstated as to all the defendants named. The case is remanded for hearing upon the merits.

LEWIS, Circuit Judge (dissenting). The bill seeks equitable relief on the claim of fraudulent conduct by some of the individual defendants. It is a stockholders' suit. The principal things complained about are, first, the transfer of the grocery business of the J. S. Brown & Brother Mercantile Company (called Old Company), in which the two complainants are shareholders, to the J. S. Brown Mercantile Company (called New Company), in which they are not shareholders; secondly, sale of stock in the New Company and certain accounts receivable belonging to the Old Company; thirdly, that the board of directors of the Old Company has used some of its funds to buy stock in the J. S. Brown Grocery Company of Pueblo (called Pueblo Co.) and in the Shields-Metzler Grocery Company of Colorado Springs (called Springs Co.); also,—but independently of the three grounds of complaint just noted,—fourthly, that certain of the Brown brothers as directors and officers of the Old Company have been and are receiving salaries in excess of what their services are worth, that they have caused the Old Company to pay excessive office rentals to their individual benefit, that they have made charitable contributions out of the funds

of the Old Company, and that they are indebted to the Old Company in large sums, although it is shown that plaintiffs are at times also in-indebted to it but not for as large amounts as the brothers. And the bill prays that a receiver be appointed for the four companies, for injunctive relief, that an accounting be had between the companies and that the Old Company be wound up, its assets sold and the money distributed.

As to the facts set up,—John Sidney Brown, through many years of industry and close attention amassed a large fortune. He built up a wholesale grocery business. It was owned and carried on by the Old Company. Much of his property not used in or connected with the grocery business was held also in the name of the Old Company. At the time of his death he owned 3,090 shares in that company. Employés owned 120 shares, other parties not in the family or the company owned 40 shares, and the remainder of the 5,000 issued shares was owned in unequal proportions by his five sons and his second wife, who survived him for three years. When he died the directing head and controlling hand in the grocery business was gone. What should be done with that business? The widow and all of his nine children, five by his first wife and four by his second, decided within six months after his death not to close it out, but to devise a plan by which it would be segregated from the other assets and continued. That plan was fully set out in a petition to the probate court in which his estate was being administered. The widow and all of his children, including the plaintiffs, signed it and there is appended to it certificates of Notaries Public that each of them, including plaintiffs, was duly sworn and upon their several oaths "depose and say that she has read the foregoing petition, and knows the contents thereof;" and it was approved by a probate court order in every particular. The petition recited that the Old Company was capitalized at 5,000 shares, each of the par value of $100, and that John Sidney Brown, at the time of his death was the absolute owner of 3,090 shares, that the company was the owner and in possession of a large and valuable stock of groceries and general merchandise pertaining to the wholesale and jobbing business, also the necessary equipment for carrying on that business, that petitioners were his only heirs-at-law and his devisees and legatees, and that they were desirous of segregating the wholesale and jobbing business and property pertaining thereto from the other business and property of the company, and to vest the title of all of said wholesale and jobbing business and of all the assets pertaining thereto in a new corporation to be formed under the laws of the state of Colorado, except $150,000 of its accounts receivable, to be selected and set aside by the executors of the estate, and to then be disposed of as expressed in the petition, that it was their wish and desire and the desire and wish of all stockholders of the company, and they believed it would be to their best interest and to the best interest of the estate to form a new corporation with an authorized capital of $1,500,000, divided into 15,000 shares, one-half to be common and the other half preferred stock, the preferred to be without voting power but to be entitled to cumulative dividends of seven per centum payable semi-annually for the first ten years of the life of the New Company and six per centum thereafter, and that $400,000

par of the preferred stock and $350,000 par of the common stock be issued to the Old Company in consideration for the conveyance to the New Company of the wholesale grocery business and its assets, that it was their desire, and that they believed it for their best interest and the best interest of the estate that, upon the formation of the New Company and the conveyance and delivery to it of the grocery business the Old Company should sell and dispose of $250,000 par value of the common stock to be issued to the Old Company by the New Company and the $150,000 of accounts receivable to be selected and set aside by the executors, in consideration of $100,000 in cash and $150,000 in promissory notes bearing six per cent., principal payable in five annual installments named, the notes to be secured by the common stock to the extent of the face of said notes plus 25%; that all of the $350,000 issued common stock be put in the name of a trustee or trustees and to remain in trust for a period of at least ten years, with power in the trustee to vote all of that common stock and to issue to the owners and depositors thereof trustee certificates therefor, and that a contract for that purpose should be made. The petition expressly requested that an order of court be made and entered fully authorizing and empowering the executors of John Sidney Brown's estate (his widow, one son by his first wife and one by his second) to vote at any special or regular meeting of the stockholders of the Old Company, or at any adjournment thereof, for any or all propositions or resolutions tending to carry into effect the purposes of the petition, and authorizing the Old Company and its officers to form a New Company and to vest it with title to the property of the Old Company pertaining to the wholesale business, in consideration for and in exchange for the $400,000 preferred and $350,000 common stock in the New Company, and thereupon to sell $250,000 par of the common and the $150,000 of the accounts receivable of the Old Company to be selected by the executors, on the terms stated in the petition, and to further make with the purchaser a contract for the placing of all of the $350,000 common stock with a trustee, as stated in the petition.

Immediately on approval in probate of the plan for continuing the grocery business by the New Company and the sale of the accounts receivable and $250,000 stock in the New Company as it was set forth in the petition, steps were taken to carry it out. The wholesale grocery business was transferred to the New Company, for which the Old Company received $400,000 in preferred and $350,000 in common stock in the New Company. The balance of the stock remains unissued. The defendant German-American Trust Co. took and holds in trust the $350,000 issued common stock, as provided for in the petition and probate order. Defendants Spicer, Parry and the two Metzlers were conducting a wholesale grocery business at Colorado Springs in the corporate name of Shields-Metzler Grocery Co., and the sale of the $250,000 common stock in the New Company and the $150,000 accounts receivable of the Old Company was made to one of the Metzlers on the terms stated in the petition filed in probate. This was all done in August, 1913. The bill alleges that the other seven children, including plaintiffs' two brothers of the full blood, still approve those transactions and all the other matters of which plaintiffs complain.

It appears that after the death of John Sidney Brown the widow and the four Brown brothers (other than Edward Newton) constituted the board of directors of the Old Company, the widow was its president. At the time the grocery business of the Old Company was turned over to the New Company the board of directors of the New Company was composed of the two Metzlers, Spicer, Parry, the widow of John Sidney Brown and two of the Brown brothers, one by the first wife of John Sidney Brown and one by his widow. Franklin T. Metzler was its president. It seems quite evident that the bringing in to the New Company of the Metzlers and their associates was for the purpose of procuring someone who was familiar with the wholesale grocery business and knew how to conduct it; and there was nothing in the transaction itself and the terms on which it was made suggestive of a fraudulent design or intent by anyone connected with it. It was all set forth in the petition to the probate court which was charged with the duty of administering the estate for the best interest of all concerned, and the entire plan in every detail had the express approval of that court. When the transactions called for in the petition were closed the Old Company owned two-thirds of the issued shares of the New Company and Metzlers and associates owned one-third.

This suit was instituted in May, 1922, almost nine years after those transactions were closed, and it seeks to have them annulled and vacated and restitution made to the Old Company through an accounting, insofar as that is possible; and the ground on which it is claimed that relief should be administered is that those transactions were brought about and consummated by fraudulent conduct between four of the Brown brothers and the Metzlers, Spicer and Parry, also that the plaintiffs signed the petition to the probate court without knowing its contents, one of them, Irene Brown Black, claiming that she relied upon her mother and statements of one or more of her brothers that they would look after her interest, but that she afterwards learned that her mother was under the control of her brothers. She was 22 years of age, unmarried and resided with her mother and two brothers when she signed the petition. She later married and now resides in the state of Washington. The other plaintiff was married at the time of her father's death and resided in Seattle, Washington. As to her, it is alleged that she came to Denver immediately on the death of her father, and that while in Denver one of her half brothers and one of her full brothers, who with her mother were named as executors in her father's will, assured her that her interest in the estate would be cared for and protected, that one of her brothers later brought the petition to Seattle and told her that its purpose was to segregate the mercantile business of the estate from its other business and affairs, that all of the other children were in favor of it, and that relying upon those statements she signed the petition, expecting her brothers to look after her interest. It is alleged that the four Brown brothers made an arrangement with the Metzlers and their associates long prior to the signing of the petition presented in probate, under which the wholesale grocery business belonging to the estate was "to be turned over to them;" and it is charged on information and belief that Metzlers and associates paid or gave to the four Brown brothers "or some one or

more of them some consideration, promise or benefit the *exact nature* of which is to the plaintiffs unknown, to influence and induce them to make the said deal in the name of the J. S. Brown & Brother Mercantile Company and to bring it about that the business of the J. S. Brown & Brother Mercantile Company should be transferred and turned over to Metzlers and associates in the name of the J. S. Brown Mercantile Company without any actual consideration," that the said transfer was made "fraudulently, corruptly and collusively for the purpose of gaining some benefit to themselves or some one or more of them, the nature of which is to the plaintiffs at present unknown and with intent and purpose to cheat and defraud the plaintiffs and the J. S. Brown & Brother Mercantile Company." And then, in doubt of the truthfulness of that charge, this follows, "or else that the said defendants were guilty of gross and inexcusable negligence." On information and belief it is alleged that the property turned over to the New Company was worth upward of $1,000,000. It is alleged that "from time to time during the times herein mentioned the plaintiff Alice Brown Martin has protested and complained to the defendants Frederick Sidney Brown, J. Sidney Brown and Carroll Teller Brown against the various acts herein complained of," and as to the plaintiff Irene Brown Black it is alleged that she placed implicit trust and confidence in her brothers that they would protect and care for her interest and that that trust and confidence "continued unimpaired until shortly before the commencement of this suit when the facts herein stated with respect to the transactions between the defendants Frederick Sidney Brown, J. Sidney Brown, Carroll Teller Brown and William Knight Brown and the defendants the Metzler party showing the true nature of such transactions and of the relations existing between the said defendants Frederick Sidney Brown, J. Sidney Brown, Carroll Teller Brown and William Knight Brown and the defendants the Metzler party, and other facts and circumstances herein set out having been learned by her she engaged counsel and started an investigation which resulted in the disclosure of the facts herein set forth, and said plaintiff says that she did not know or understand such facts until that time." It is alleged, several times, that the plaintiffs did not know until "shortly" before the commencement of this suit the *real nature* of the alleged arrangement between the Brown brothers and the Metzlers, Spicer and Parry, but it is admitted that "they understood that a working interest therein (grocery business) had been sold to the Metzler party for an actual consideration in money."

It will be observed that both plaintiffs allege that the *nature* of the fraudulent arrangement under which the transfer to the New Company was made, was unknown to them at the time they instituted this suit, then the plaintiff Irene Brown Black alleges that she learned the facts and circumstances set out in the bill and the *true nature* of the transactions and relations between her brothers and the Metzlers and associates before she engaged counsel, and in the same sentence she alleges that she engaged counsel and started an investigation which resulted in the disclosure of the facts set out in the bill. She adds that she did not know or understand the facts until she engaged counsel. Then as to both plaintiffs it is alleged that they did not know until

"shortly" before the commencement of this suit the *real nature* of the arrangement between their brothers and Metzlers and associates. It is alleged that the four Brown brothers made an arrangement with the Metzlers and their associates prior to the signing of the petition to turn over the grocery business of the estate to the Metzlers and associates, and that the Metzlers and associates paid or gave to the four Brown brothers "or some one or more of them some consideration, promise or benefit, the *exact nature* of which is to the plaintiffs unknown." Again, the plaintiff Alice Brown Martin alleges that "from time to time during the times herein mentioned" she protested and complained to her brothers against their various acts complained of in the bill. The bill shows that the grocery business was turned over to the New Company by the Old Company in accordance with the terms stated in the petition presented to the probate court, and yet it charges that business was turned over to the "Metzler party" by the four Brown brothers.

The bill attempts argumentatively to make it appear that the purchase from the Old Company by Metzler of the accounts receivable and stock in the New Company were separate transactions, by which Metzler got $150,000 accounts receivable from the Old Company for $100,000 cash, to the detriment and damage of the Old Company in the sum of $50,000. This flies in the face of the real transaction disclosed by the petition in probate, by which Metzler bought the acounts receivable *and* the stock for $250,000, to be paid for by $100,000 in cash and notes for $150,000. I lay aside the inquiry whether the allegations that have been noticed are so inconsistent and repugnant as to destroy and neutralize each other, and consider them in connection with the question of laches. I find no other allegation that will aid the plaintiffs on that subject. The allegation that when plaintiff Mrs. Martin made complaints and protested from time to time to her brothers they threatened that if she insisted on her rights they would stop payments of dividends to her by the Old Company contradicts her assertion that she relied on them to protect her interests until shortly before the institution of this suit. Moreover, this claim by both plaintiffs of continued trust and confidence in their half brothers is refuted by the litigation between the two sets of children over the division of the widow's estate. 69 Colo. 400, 194 Pac. 943. They delayed bringing this suit for nine years after the grocery business was turned over to the New Company, and stock in it and accounts receivable belonging to the Old Company were sold to Metzler. They admit that they were informed when they signed the petition that its purpose was to segregate and turn over the grocery business of the Old Company to another company, and they admit that they knew that a working interest in the grocery business had been sold to the Metzler party. They must have known that a multitude of financial and business transactions changing and affecting the rights of every one interested in and connected with the Old and the New companies and the grocery business would at once arise, and they must have known that as time went on it would grow more and more difficult to restore the status quo without seriously and disastrously affecting those interests. They have failed, in my judgment, to allege any facts assigning reasons for not acting

promptly. The Colorado Statute of Limitations applicable to the case reads thus: "Bills for relief, on the ground of fraud, shall be filed within three years after the discovery by the aggrieved party of the facts constituting such fraud, and not afterwards." Compiled Laws Colo. 1921, § 6403 (Rev. Stat. Colo. 1908, § 4072). This court, in considering that statute in Kelley v. Boettcher, 85 Fed. 55, 62, 29 C. C. A. 14, 21, said:

"In the application of the doctrine of laches, the settled rule is that courts of equity are not bound by, but that they usually act or refuse to act in analogy to, the statute of limitations relating to actions at law of like character [citing authorities]. The meaning of this rule is that, under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after the time fixed by the analogous statute of limitations at law; but if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it. * * * When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show, either from the face of the bill or by his answer, that extraordinary circumstances exist which require the application of the doctrine of laches; and, when such a suit is brought after the statutory time has elapsed, the burden is on the complainant to show, by suitable averments in his bill, that it would be inequitable to apply it to his case."

The Supreme Court, in Wood v. Carpenter, 101 U. S. 135, 140 (25 L. Ed. 807), held that the rules of pleading in this respect are stringent, and said:

"A general allegation of ignorance at one time and of knowledge at another are of no effect. If the plaintiff made any particular discovery, it should be stated when it was made, what it was, how it was made, and why it was not made sooner. * * * The fraud intended by the section which shall arrest the running of the statute must be one that is secret and concealed, and not one that is patent or known. * * * 'Whatever is notice enough to excite attention and put the party on his guard and call for inquiry, is notice of every thing to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it. * * * The presumption is that if the party affected by any fraudulent transaction or management might, with ordinary care and attention, have seasonably detected it, he seasonably had actual knowledge of it.' * * * A party seeking to avoid the bar of the statute on account of fraud must aver and show that he used due diligence to detect it, and if he had the means of discovery in his power, he will be held to have known it."

In Hardt v. Heidweyer, 152 U. S. 547, 560, 14 Sup. Ct. 671, 674 (38 L. Ed. 548), it is said:

"Tested by this rule, it is apparent that this bill must be held deficient in not showing how knowledge of the wrongs complained of was obtained by the plaintiffs. It is alleged that they were ignorant, and now have knowledge; and that they acquired such knowledge within a month prior to bringing the suit; but how they acquired it, and why they did not have the same means of ascertaining the facts before, is not disclosed."

See also Beaubien v. Beaubien, 23 How. 190, 208, 16 L. Ed. 484; Burke v. Smith, 16 Wall. 390, 401, 21 L. Ed. 361; O'Brien v. Wheelock, 184 U. S. 450, 493, 22 Sup. Ct. 354, 46 L. Ed. 636; Reed v. Dingess (C. C.) 56 Fed. 171; Swift v. Smith, 79 Fed. 709, 25 C. C. A. 154; Williamson v. Beardsley, 137 Fed. 467, 69 C. C. A. 615; Redd

v. Brun, 157 Fed. 190, 84 C. C. A. 638; Jewell v. Trilby Mines Co., 229 Fed. 98, 143 C. C. A. 374; Pipe v. Smith, 5 Colo. 146.

The plaintiffs knew that the grocery business was to be transferred to a new company in the summer of 1913, when they signed the petition, and they also knew at that time, or were negligent in not knowing, that 250,000 shares of common stock in the New Company and $150,-000 of acounts receivable belonging to the Old Company were to be sold for $250,000. They were barred by their laches from questioning or repudiating those transactions at the time they instituted this suit.

There is another Colorado statute. Section 6404, Compiled Laws 1921 (section 4703, Rev. Stat. 1908). It reads thus:

"Bills of relief, in case of the existence of a trust not cognizable by the courts of common law, and in all other cases not herein provided for, shall be filed within five years after the cause thereof shall accrue, and not after."

Its relevancy rests on the assumption that the relation between plaintiffs and their brothers was one of trust, contemplated by the statue. See Morgan v. King, 27 Colo. 539, 63 Pac. 416. But the facts disclosed in the bill also fail, in my opinion, to excuse the plaintiffs of their laches in not acting within the time limited by that statute. So much for the first and second matters about which complaint is made.

As to the third matter complained about, the articles of incorporation of the Old Company gave to it express power "to acquire by purchase, or otherwise, shares of the capital stock in other corporations, and to receive such stock in payment for any property which the company may sell, lease or otherwise dispose of, and to vote upon any and all of the capital stock of other corporations which this company may acquire, own or hold, absolutely or in pledge, or hold as collateral security; and generally to do and perform all such things and acts as the Board of Directors may deem desirable or expedient in the transaction of the company's business." The complaint is that funds of the Old Company were used to buy shares of the capital stock in the Springs Co. and the Pueblo Co. That power and right, as seen, was expressly vested in the Old Company, and the plaintiffs seek to avoid those transactions on the claim that they were part of the general scheme by which the so-called Metzler party, and perhaps also the four Brown brothers, were to obtain control, management and use of the Old Company and its funds and grocery business; and further, the bill attempts argumentatively to show on that subject that the Springs Co. and the Pueblo Co. are both insolvent. For the purpose of this dissent I need only say that in my opinion there are no facts and circumstances set up in the complaint showing, or tending to show that such a fraudulent scheme existed or was ever concocted; and as to the second, the facts stated show that both of those companies are solvent. They each have a surplus of assets and each has been paying dividends on the issued stock at substantial rates.

In this state of the case the district judge sustained separate demurrers to the bill, which let out of the case all of the defendants except the Old Company and its board of directors, and entered an order that the demurrers of the Old Company and individual defendants constituting its board of directors would also be sustained unless the plaintiffs,

within a time stated, reformed their pleading and by amended bill charged and sought relief against the Old Company and its board of directors only as to the matters about which complaint was made against them. This left the plaintiffs free to go on with their case on their charges that their brothers had been paying themselves excessive salaries out of the funds of the Old Company and otherwise disposing of those funds, as heretofore stated, without benefit or compensation to it. In that regard the facts set up made a case. They could be stated in brief space. They had no relation to the other facts which have been considered. It was a proper order to put all matter extraneous that subject out of the case. But the plaintiffs were not willing to restrict their bill and confine the relief sought to that subject; so they stood upon the original bill, and under the order it was dismissed as to the remaining defendants. For reasons stated I think the court was right in both respects.

Counsel for plaintiffs argues earnestly that the bill is good and should stand for purposes of discovery in all of the transactions complained of. But the bill expressly waives answer under oath, and for that reason it could not be availed of as a bill of discovery under the prior practice; nor have the plaintiffs attached interrogatories, as now required by Equity Rule 58, for that purpose. Luten v. Camp (D. C.) 221 Fed. 424, and cases cited.

I regret the length of this dissent. But allegations without proof and proof without allegations are equally fatal; and to require answer and trial, which will evidently be greatly burdensome and very expensive, on such vague and contradictory charges of fraud, with no facts relieving the plaintiffs from the bar on account of their laches, is, it seems to me, unjust and contrary to settled principles.